# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**14-19**


**STATE OF LOUISIANA**

**VERSUS**

**ERIC J. BELLO**


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 12281-09
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, James T. Genovese, and John E. Conery, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**14th Judicial District**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward J. Marquet**
**Louisiana Appellate Project**
**Post Office Box 53733**
**Lafayette, Louisiana 70505-3733**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Eric J. Bello**

**CONERY, J.**

On March 12, 2008, Defendant, Eric J. Bello, was indicted for the second degree murder of his first cousin, Pauline Bryant. A sanity hearing was held on August 19, 2009, and again on May 19, 2010. Following the hearings, the trial court found Defendant competent and capable to proceed to trial. On November 18, 2010, Defendant changed his not-guilty plea to not guilty by reason of insanity.

On November 7, 2011, a second "Motion to Appoint Sanity Commission" was filed. Hearings were held on January 1, 2012, and September 12, 2012. On October 31, 2012, the trial court again adjudicated Defendant competent and capable to proceed to trial. Defendant was subsequently found guilty of second-degree murder. He was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.

Defendant has perfected a timely appeal wherein he alleges that the trial court erred when it adjudicated him competent and capable to proceed to trial. For the following reasons, we find that Defendant's assignment of error lacks merit.

## FACTS

On November 4, 2008, Defendant shot his first cousin, Pauline Bryant. Ms. Bryant died as a result of the gunshot wound. Defendant remained with Ms. Bryant's body for about forty-eight hours before calling 911.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

Defendant was informed at sentencing that he had two years within which to file an application for post-conviction relief. Louisiana Code of Criminal

Procedure Article 930.8(A) provides that the defendant has two years *after the conviction and sentence become final* to seek post-conviction relief. In line with this court's past jurisprudence, we find the trial court's advisement insufficient and we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8(A) by sending appropriate written notice to Defendant within thirty days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *State v. Conway*, 12-525 (La.App. 3 Cir. 11/7/12), 101 So.3d 1132; *State v. Celestine*, 11-1403 (La.App. 3 Cir. 5/30/12), 91 So.3d 573; *State v. Grace*, 10-1222 (La.App. 3 Cir. 4/6/11), 61 So.3d 812, *writ denied*, 11-961 (La. 10/21/11), 73 So.3d 382.

## ASSIGNMENT OF ERROR

Defendant argues that the trial court erred when it adjudicated him capable of assisting in his defense. He asserts that he has proven by a preponderance of the evidence to have a "highly probable diagnosis of Paranoid Schizophrenia," which rendered him incapable of assisting in his own defense and, hence, not competent to stand trial.

In *State v. Bennett*, 345 So.2d 1129, 1138 (La.1977), the Louisiana Supreme Court stated that the appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include:

> whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.

In addition, the supreme court provided factors to consider in determining an accused's ability to assist in his defense:

2

whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.

*Id*.

The supreme court further provided that "[t]he decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced." *Id*. Moreover, the supreme court stated:

The defense carries the burden of proving by a clear preponderance of the evidence that, as a result of a mental disease or defect, he lacks the capacity to understand the proceedings against him or to assist in his defense. Moreover, the judge's determination of a defendant's present mental capacity is entitled to great weight and his ruling will be reversed only if it is clearly erroneous.

*Id*. at 1132 (citations omitted).

In the instant case, at the August 19, 2009 sanity commission hearing, Dr. James M. Anderson, a Lake Charles medical doctor board-certified in psychiatry and neurology, testified that he evaluated Defendant on May 22, 2009. He conducted a fifty-five minute session with Defendant where he assessed Defendant's general fund of knowledge and medical and psychiatric history. He also had Defendant complete a McGarry Competency Assessment test. Dr. Anderson stated that although Defendant was sometimes "inappropriate and somewhat guarded and evasive," he was able to understand the role of his attorney

3

and knew the difference between guilty and not guilty by reason of insanity. He also knew the difference between the participants, such as the judge, jury, and witnesses. He knew that he was charged with second-degree murder and the consequences if he was found guilty.

Dr. Anderson reported that Defendant told him he was a college graduate with a degree in business management from Brigham Young University in Hawaii. Dr. Anderson stated that the medications Defendant was taking at the time of the evaluation were Hydrochlorothiazide, Amlodipine, Enalapril, and Zoloft, which were medications for anti-hypertension and depression. Dr. Anderson found Defendant to be cooperative but calculating in his answers. Dr. Anderson stated that when he asked Defendant if he had a history of any psychiatric hospitalization, Defendant said, "[c]ould you be more specific with the question?" In the context of the evaluation, Dr. Anderson found Defendant evasive and manipulative. However, as noted, Dr. Anderson found him competent to stand trial and memorialized his findings in a formal letter that was introduced into evidence.

Dr. Charles Robertson, a Lake Charles neuropsychologist, testified on the issue of Defendant's capacity to assist in his defense at the May 19, 2010 hearing. Dr. Robertson stated that he saw Defendant on May 8, 2009, in his office for approximately an hour. Dr. Robertson also found Defendant to be competent to proceed to trial. Dr. Robertson stated that Defendant reported no history of any psychosis but that he had been treated for depression. He reviewed the drugs Defendant reported taking and noted that although he believed that Defendant benefited from the medication, it would not necessarily impede his ability to attend trial if he were not taking the medication. Dr. Robertson also memorialized his conclusion in a formal letter submitted to the trial court and filed into evidence.

On November 7, 2011, Defendant filed another "Motion to Appoint Sanity Commission." In the motion, he asserted that he had been evaluated by a Dr. Theodore Friedberg, who concluded that Defendant was unable to assist defense counsel because it was highly probable that Defendant suffered from paranoid schizophrenia. The trial court granted the motion and appointed Drs. Anderson and Robertson to re-evaluate Defendant. The court set a sanity hearing for January 25, 2012.

At that hearing, Dr. Anderson reported that he saw Defendant on three separate occasions: May 22, 2009, February 23, 2010, and on January 12, 2012. Again, after the January 12, 2012 meeting, Dr. Anderson concluded that Defendant was competent to proceed to trial. He submitted a letter to the trial court with his findings that was filed in evidence.

In his written report to the trial court, Dr. Anderson noted that Defendant was taking several more drugs since he first interviewed him. At the hearing, he testified:

> When I saw him on January 12th, he was taking Depakote, which is an anti-seizure medication; but I'm assuming it's used in this case as a mood-stabilizing medication used in bipolar disorder.
>
> His second medication was Risperdal, which is anti-psychotic medication, which is also used not only for schizophrenia but for bipolar disorder.
>
> He was taking Zoloft, an antidepressant medication; Vistaril, which is used for most likely insomnia. He was taking 50 milligrams at night and just taking two blood pressure medications.

Dr. Anderson stated that Defendant told him that he had been diagnosed with a schizophrenic bipolar condition, which, Dr. Anderson testified, was not a real diagnosis. However, Dr. Anderson stated that even though he was taking the medications listed, Defendant still met the *Bennett* criteria. It was the doctor's

5

opinion that Defendant was cognitively intact. When asked by defense counsel if being cognitively intact meant that one necessarily met the *Bennett* criteria, Dr. Anderson answered that it did not. He explained, however, that he believed Defendant attempted to purposefully control the interview to manipulate him. He stated that when Defendant was asked questions concerning his history of mental health or current status, Defendant would pause to think about it and would answer with questions like "what type of details are you looking for?"

Because Dr. Robertson was deceased by the time of the hearing, the sanity hearing was continued until such time as another qualified doctor had the opportunity to evaluate Defendant. The court appointed Dr. Garrett Ryder.

At the scheduled hearing on September 12, 2012, Dr. Ryder testified regarding Defendant's mental capacity to proceed to trial. His report was submitted to the trial court and filed into evidence. The report indicated that Defendant was able to proceed to trial pursuant to the criteria set out by *Bennett*. At the hearing, he indicated that he had received no medical history on Defendant. He stated that Defendant self-reported that he was suffering from schizophrenia or bipolar disorder. He stated that from his interview with Defendant, he "suspected that he probably did have a schizophrenic spectrum condition." However, he explained he was not convinced that Defendant suffered from schizophrenia or a bipolar disorder. While Dr. Ryder felt that "[Defendant] was sufficiently nervous, restless, and autistic in some responses . . . he was sophisticated enough, intellectually, to be able to sort of manufacture those."

Defense counsel then informed the trial court that Defendant desired Dr. Friedburg to testify, but he was not immediately available. The following conversation then took place between the trial court and defense counsel:

THE COURT: Have you ever spoken with Dr. Friedberg?

MR. MCHALE: No, sir, I haven't. I've only read his reports, and I've spoken to –

THE COURT: Does [sic] his reports indicate that your client would be – that he would testify contrary to what we heard from Dr. Ryder and Dr. Anderson?

MR. MCHALE: Perhaps, yes, sir.

THE COURT: I don't want to hear perhaps.

MR. MCHALE: Well --

THE COURT: You read his report?

MR. MCHALE: Yes, sir.

THE COURT: It either says he's competent, or he's not competent, or I can't tell.

MR. MCHALE: At the time of the report, Mr. Bello – upon one meeting, Mr. Bello became agitated and refused to speak with Dr. Friedberg. But Dr. Friedberg has stated that he feels that my client has chronic paranoid schizophrenic disorder.

THE COURT: Would that prohibit [him] from assisting his counsel in his defense at trial?

MR. MCHALE: Yes, sir.

THE COURT: He believes that?

MR. MCHALE: Well – and he doesn't specifically state that.

The State then informed the trial court that Dr. Friedburg's report addressed the issue of the not-guilty-by-reason-of-insanity plea rather than whether Defendant was competent to proceed to trial. The trial court continued the hearing until October 31, 2012, to allow Defendant to "present any witnesses that they have in connection with the determination of whether or not this defendant has the competency to proceed to trial."

7

A minute entry dated October 31, 2012 indicates that the hearing was held. However, no other witnesses were presented, and the trial court found Defendant capable to assist defense and proceed to trial.

In brief, Defendant argues that Defendant's "extraordinary, bizarre behavior" coupled with the medical opinions supported a conclusion of incompetence to stand trial. The "extraordinary, bizarre behavior" he refers to was testimony and evidence presented at trial regarding the killing of the victim, what he said to the 911 operator when he called to report that he had just shot her, how long after the shooting until he called 911, the books on infamous murderers found in his house, the fact he left a last will and testament on a chalk board at the scene, portions of his testimony wherein he referred to the victim as his wife, and, when asked at trial for the reason he killed the victim, he responded, "[c]an you be more specific with the question, please." He argues that "[t]his illustrates that as a practical matter Mr. Bello could do little to assist in his defense and as demonstrated at trial did not assist in his own defense due to his mental condition of Paranoid Schizophrenia."

The issue of not guilty by reason of insanity relates to a defendant's inability to distinguish right from wrong at the time he committed the offense and is to be considered by the fact finder at trial. La.R.S. 14:14; La.Code Crim.P. art. 650, *et seq*. That issue is not before the court and is not part of this appeal. In contrast, the question of competency to proceed to trial addresses whether a defendant had the capacity to understand the proceedings against him and assist in his defense and is an issue for the trial court to resolve before trial. La.Code Crim.P. arts. 641 and 647.

8

We find that Defendant has failed to prove by a preponderance of the evidence that, as a result of a mental disease or defect, he lacked the capacity to understand the proceedings against him or to assist in his defense. The trial court was asked to assess the evidence given prior to the trial to determine whether Defendant had the capacity to proceed to trial. Three qualified experts evaluated Defendant over a two-year period and determined that he was able to assist in his own defense and had the capacity to proceed to trial. All three experts testified at the sanity hearings. Dr. Friedburg did not testify at the hearings, nor did he testify at trial. Therefore, we find that Defendant's assignment of error lacks merit.

## DISPOSITION

We affirm Defendant's conviction and sentence. Additionally, we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within thirty days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**