**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**22-553**

**STATE OF LOUISIANA**

**VERSUS**

**JASON RAY CRAFT**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-987-19
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GUY E. BRADBERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Wilbur L. Stiles, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**Pride J. Doran**
**Doran & Cawthorne, PLLC**
**P.O. Box 2119**
**Opelousas, LA 70571**
**(337) 948-8008**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Jason Ray Craft**

**Lauren C. Heinen**
**District Attorney**
**Torrie S. Thibodeaux**
**Assistant District Attorney**
**Thirty-First Judicial District Court**
**P.O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**BRADBERRY, Judge.**

Defendant, Jason Ray Craft, was charged by indictment filed on August 23, 2019, with first degree rape, a violation of La.R.S. 14:42. The "State's Motion to Amend Bill of Indictment" was filed and presented on January 29, 2022, and the amendment was allowed. Thus, the date of the offense was changed from June 30, 2019, to on or between June 30, 2019 and July 1, 2019.

Trial by jury commenced on January 25, 2022, and the jury returned a verdict of guilty on January 31, 2022. On February 14, 2022, Defendant presented a Motion for Post-Verdict Judgment of Acquittal and Alternative Motion for New Trial. The motions were denied. Thereafter, Defendant was sentenced to life in prison without benefit of probation, parole, or suspension of sentence.

Defendant's motion for appeal was filed and granted on March 7, 2022. Defendant is before this court asserting six assignments of error. For the following reasons, we find these assignments of error lack merit.

## FACTS

Defendant was convicted of the first degree rape of S.B., who was under thirteen years of age at time of the offense in 2019.[1]

## ERRORS PATENT

After reviewing the record, we find there is one possible error in the trial court's failure to observe the twenty-four-hour delay required by La.Code Crim.P. art. 873.

The trial court sentenced Defendant immediately after it denied Defendant's motion for new trial and motion for post-verdict judgment of acquittal. At the

---

[1]The victim's initials are used in accordance with La.R.S. 46:1844(W)(1)(a).

beginning of the sentencing hearing, the trial court asked defense counsel if Defendant was ready for sentencing. Defense counsel responded:

> Good morning, Your Honor. Prior to sentencing, we filed a motion for a post-verdict - - a post-judgment verdict of acquittal or in the alternative a motion for a new trial. I would ask that the motion that we're submitting be filed under seal based on some of the information that we will need to put on the record.

Although the trial court stated that the motions were denied, defense counsel asked to make an argument for the record. After arguments were presented, the trial court again stated that the motions were denied. Following a brief discussion about a copy of one of the motions, the trial court stated, "Okay. Mr. Craft, come forward, please. Stand at the podium." The record indicates Defendant complied. The trial court asked once again if Defendant was ready for sentencing and asked if there was anything else defense counsel wanted to urge. Defense counsel replied, "No, Your Honor, not at - - not at this time." The trial court then sentenced Defendant to life imprisonment without benefit of parole, probation, or suspension of sentence.

Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied*, __ U.S. __, 138 S.Ct. 1175 (2018), the supreme court found the waiver must be express, not implicit. Distinguishing between the two types of waivers, the court explained that merely participating in the sentencing hearing would be considered an implicit waiver. Although announcing a readiness for sentencing had been

2

considered an implicit waiver by some appellate courts, the supreme court explained that such a waiver should really be considered an express waiver. *Id.* Subsequently, in *State v. Boyd*, 17-1749 (La. 8/31/18), 251 So.3d 407, the supreme court found an express waiver was made when the defense responded that it had no objection to proceeding with sentencing.

It is not clear whether defense counsel's responses in the present case would be considered an express waiver. Nevertheless, the supreme court in *Kisack* made it clear that an Article 873 violation may still be considered harmless. This court recently stated the following about the harmless error analysis after *Kisack*:

> Prior to the decision in *Kisack*, errors in failing to observe Article 873's delay were found harmless when "a mandatory life sentence was imposed or when the defendant did not challenge his sentence on appeal and did not claim prejudice due to the lack of the delay." *State v. Holden*, 19-867, p. 8 (La.App. 3 Cir. 7/15/20), 304 So.3d 520, 524, *writ denied*, 20-1016 (La. 2/9/21), 310 So.3d 174. Since *Kisack*, courts have continued to find harmless error where a mandatory life sentence is imposed or when the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. *State v. Chester*, 19-363 (La.App. 5 Cir. 2/3/21), 314 So.3d 914, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321; *State v. Samuel*, 19-408 (La.App. 3 Cir. 2/5/20), 291 So.3d 256, *writ denied*, 20-398 (La. 7/24/20), 299 So.3d 77 (the court also found an express waiver); *State v. Stafford*, 20-299 (La.App. 1 Cir. 2/22/21), 321 So.3d 965 (the court also found an implicit waiver); and *State v. Brown*, 20-150 (La.App. 1 Cir. 2/19/21), 2021 WL 650816 (unpublished opinion), *writ denied*, 21-458 (La. 6/1/21), 316 So.3d 835.

*State v. Griffin*, 21-452, p. 4 (La.App. 3 Cir. 3/2/22) 351 So.3d 385, 388 (footnote omitted), *writ denied*, 22-600 (La. 6/1/22), 338 So.3d 496. *See also State v. Worley*, 21-688 (La.App. 3 Cir. 8/3/22), 344 So.3d 757, *writ denied*, 22-1381 (La. 12/20/22), ___ So.3d ___.

In the present case, a mandatory life sentence was imposed, and Defendant does not challenge his sentence on appeal. Thus, we find any error in the trial court's failure to abide by the Article 873 delay was harmless.

## ASSIGNMENT OF ERROR NUMBER SIX

In his sixth assignment of error, Defendant contends the evidence was insufficient to support the guilty verdict of first degree rape. "When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Thus, we will address Defendant's sixth assignment of error first.

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Weary*, 2003-3067 p. 17 (La.4/24/06), 931 So.2d 297, 310, [*cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006)]; *State v. Captville*, 448 So.2d 676, 678 (La.1984). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Dabney*, 2002-934 p. 1 (La.4/9/03), 842 So.2d 326, 327; *State ex rel. Graffagnino v. King*, 436 So.2d 559, 563 (La.1983) ("It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond our sufficiency evaluations under the *Jackson* standard of review."). "However, we are mindful that the touchstone of *Jackson v. Virginia* is rationality and that '*irrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.' " *State v. Davis*, 2002-1043 p. 2-3 (La.6/27/03), 848 So.2d 557, 558 *citing State v. Mussall*, 523 So.2d 1305, 1310 (La.1988) (emphasis in original).

*State v. Ordodi*, 06-207, p. 10 (La. 11/29/06), 946 So.2d 654, 660.

Defendant was convicted of first degree rape in violation of La.R.S. 14:42(A)(4), which provides that "[f]irst degree rape is a rape committed . . . where

4

the . . . vaginal sexual intercourse is deemed to be without lawful consent of the victim because . . . the victim is under the age of thirteen years." "Emission is not necessary, and any sexual penetration, when the rape involves vaginal . . . intercourse, however slight, is sufficient to complete the crime." La.R.S. 14:41(B).[2]

The State's first witness was Dr. Scott Bergstedt, who was accepted as an expert in the field of obstetrics and gynecology with a specialty in the forensic examination of sexually abused children. He examined S.B. on July 25, 2019. S.B. was ten years old at the time of her visit. During the examination, S.B. described two episodes that occurred within a twenty-four-hour period. S.B. told Dr. Bergstedt:

> Jason Craft, who is her 39-year-old mother's ex-boyfriend at the time, was living with them at the home. Mom was at work, and [S.B.] had stated that Jason had been drinking. At around noon on 6/30/2019, she was sleeping on the sofa in shorts and a t-shirt. She describes as Jason grabbed and pulled her off - - off the side of the sofa and pulled her pants and panties down while she was laying on her stomach. She felt his penis from behind, and it was uncomfortable but denies him penetrating her at that time. She acted like she was asleep. So there was no conversation between them at that time. He stopped after a while and pulled her pants and panties back up and laid her back on the sofa.
>
> Later that night at about 1:30 in the morning on 7/1/2019, she was sleeping, again, on the sofa in the living room. Jason pulled her pants and panties down again. She was laying on her back at this time. He put his penis in her vaginal area. She stated it hurt and blood was noted. It lasted about five minutes she said. She acted like she was asleep. She denies any oral or anal sex at either episode and denies any witnesses, photos, porn, or bribes.

S.B. denied any previous sexual interactions, abuse, or episodes. She also denied any prior use of tampons.

---

[2] Louisiana Revised Statutes 14:41(B) was amended by 2022 La. Acts, No. 173, § 1, to provide that penetration is sufficient 'whether [it] is accomplished using the genitals of the offender or victim or using any instrumentality and however slight[.]

Dr. Bergstedt testified that S.B. had a healed hymenal tear at the four o'clock position, "imply[ing] that there ha[d] been penetration between the lips into the vaginal area, and that was the - - the main finding during the physical exam part." Dr. Bergstedt further testified that his findings were consistent with the SANE exam performed on July 1, 2019. He addressed the issue:

> And their findings basically showed redness and bleeding in the areas of really about three, four, and five o'clock positions, and then they also had an area over on the eight o'clock position.
>
> Now, this area heals very, very quickly. So the fact that she had red bleeding areas at the time of her visit on 7/1, which was the - - the day of or later the day when all this occurred, and then when I find a consistent healed scar there 24 days later, that is consistent with probably pene- - - not probably, it's consistent with penetration at the time when she presented. And that's the healed scaring from that that I saw on colposcopy.
>
> So that's - - it was consistent with the finding of the SANE nurse as well as what I saw on my exam.

Dr. Bergstedt could not determine the exact time S.B.'s injury occurred.

In his report, Dr. Bergstedt concluded there was a healed hymenal laceration at the four o'clock position, the findings were consistent with the history given, the injuries were consistent with penetration and sexual abuse, the findings were not consistent with repeated penetration, and there were no other findings consistent with sexual activity.

S.B. gave no history of sexual activity prior to June 30, 2019. Dr. Bergstedt could not determine if S.B. had sex prior to that date, could not say from his exam that her injuries occurred on that date, and could not say Defendant was involved.

On re-direct, Dr. Bergstedt was questioned as follows:

> Q ... Dr. Bergstedt, you just stated that you're not able to testify as to medical - - with medical certainty whether or not there were any previous sexual encounters; is that correct?

A Correct.

Q However, your finding - - your - - one of your conclusions was that there is not a history of sexual activity?

A Correct.

Q And that in my understanding is that that's because there's only one hymenal tear, and there was still hymenal [t]issue there; is that correct?

A Correct.

Q And it's also - - is it also correct that your findings are consistent with the history that you were provided?

A Correct.

Q And that was provided by [S.B.]?

A Correct.

Shaun Ray Lamas, the victim's father, was the State's next witness.[3] Lamas was in Laredo, Texas, in June and July of 2019. He learned of the incident on July 1, 2019, when S.B. texted him at 1:05 a.m. S.B.'s text said, "he just raped me." Thereafter, Lamas made a Facebook post regarding the rape in an attempt to protect his daughter. Lamas agreed his reply to the text was "don't worry, you'll be home soon[.]"

Jacob Bellard testified he was S.B.'s uncle as Brittany Hanks, the victim's mother, was his sister. He saw Lamas' Facebook post relating to S.B. and texted S.B.'s mother.

---

[3]Lamas had been incarcerated in 2019, for possession of heroin occurring in 2017. He was arrested in Texas for the 2017 charge while on his way to see S.B. He was released from jail in 2020.

Brittany Hanks was the mother of S.B., whose date of birth was September 18, 2008.[4] In June of 2019, she and her three children lived with Defendant. Hanks learned of the rape via text message from her brother on July 1, 2019. She then woke up S.B. Hanks said S.B. was baffled and extremely calm. After speaking to S.B., Hanks examined her. Hanks did not insert anything inside S.B. or touch her. Hanks and S.B. pretended everything was fine until Defendant left for work. Thereafter, Hanks brought S.B. to the hospital in Jennings and then Lake Charles. According to Hanks, S.B. did not injure her pelvic area in the few weeks before the incident.

Hanks had no concerns that S.B. was sexually curious or having sex. She did not recall the age of her neighbor but knew he was a teenager. The neighbor did not visit on a "periodic basis." Additionally, S.B. did not make any allegations against the neighbor, and Hanks had no reason to believe that S.B. would accuse Defendant if the neighbor actually raped her.

To Hanks' knowledge, Defendant's only child was his son Ty, who was not at her home on June 30 or July 1, 2019. Moreover, she did not see Ty often. Hanks testified that Defendant did not have any brothers, and Defendant had no male relatives at the home during the month before the incident at issue.

Next, the State presented the testimony of S.B. She confirmed she was born on September 18, 2008, and was thirteen years old at the time of trial. S.B.'s CAC (Children's Advocacy Center) interview was introduced as State's Exhibit 2 and was published to the jury.

---

[4] Hanks was previously charged with unauthorized use of an access card but paid the money back. She was also questioned about a DCFS investigation regarding drug use and neglect in 2018.

In the interview, S.B. stated she was ten. S.B. said she was watching a movie with Defendant after her mom and siblings went to bed, and she fell asleep. She subsequently woke up but was still half asleep, and Defendant had her over the couch. She was kneeling on the floor, and her stomach was on the couch. Defendant pulled down her shorts and underwear. S.B. was scared and pretended to be asleep because she did not know what to do. Defendant put his "thing" in her "thing" for five to ten minutes. She reported it hurt so bad she thought she was going to die. Defendant then put her back on the couch and said, "I love you baby girl" and kissed her on the neck. He then asked if she wanted to stay on the couch or go to her bed. After Defendant fell asleep, she went to her room. S.B. did not wake her mom because she did not want to start anything. Her first thought was to text her dad. S.B. then went to sleep. The next morning her mom woke her up asking for S.B.'s phone. S.B. did not want to get in trouble because her mom did not like her talking to her dad. S.B.'s mom then showed her a text from S.B.'s uncle, and S.B. told her mom what happened. Thereafter, S.B.'s mom checked her pelvic area. When Defendant left for work, S.B. was taken to the hospital.

S.B. explained to the interviewer that her dad made a Facebook post about the incident. S.B.'s uncle saw the post and reported it to her mother.

S.B. also described another incident. S.B. stated that that afternoon she was taking a nap, and Defendant tried putting his "thing" in her "thing." However, he did not actually do it. S.B. was on her stomach and did not really feel anything. Defendant then got out of bed and left the room. S.B. reported that Defendant's private was on top of her "bladder" that day and inside her "bladder" that night.

S.B. told police Defendant attempted to have sex with her around noon on June 30, 2019, and he had sex with her on July 1, 2019, around 1:00 a.m. Thereafter, she texted her father. The texts were introduced as Defense Exhibit 1.

S.B. testified that Dr. Bergstedt's report as to the location of the first event was incorrect. S.B. said she was in Defendant's bed the first time.

S.B.'s cell phone was searched by police. She had used the phone to text her father and search websites. She denied using the site pornhub.com before the incident. She also denied conducting Google searches for "a whole party has sex," "sex that never ends," and "kids having sex and p-a-r-e . . . . " S.B. was further questioned about the phone as follows:

Q      Did anyone else have access to your phone?

A      I'm not sure.

Q      Okay. You usually kept your phone close to you, correct?

A      No, ma'am.

Q      No?

A      (Witness shakes head negatively.)

Q      Okay. You were not on it often?

A      No, ma'am.

Q      Okay.

A      In fact, texting my dad was the first time I've gotten on it in a real long time. I had to charge it because it - - it was dead, and I haven't used it, so - -

Q      Okay. And did your phone contain a password lock?

A      I believe so.

Q      Okay. And you were the only one who knew that password, correct?

10

A     No, ma'am.

Q     Okay. Who else had known that password?

A     I know my mom knew it for sure, and I'm not sure who else knew it, but I know - -

Q     Okay.

A     - - I wasn't the only one who knew it.

Q     So, to your knowledge, your mom was the only one else besides you who knew that password, correct?

A     Correct.

Before S.B. texted her father, she had to charge the phone, which she believed had been in the closet in a bag she had used when she went to someone else's house.

Patra Minix was the director of the Children's Advocacy Center. She testified that while S.B. was discussing the specifics of the incident during the CAC interview, S.B.'s "shoulders were crouched. She kind of balled up, and there was a lower tone in her voice." This continued while S.B. discussed the event, but S.B. returned to her "energized self[]" when the subject changed. Anatomical drawings used during the forensic interview were introduced as State's Exhibit 3. Minix asked S.B. to circle what part of Defendant touched her. On the anatomical drawing of a male, S.B. circled the mouth and penis and labeled the penis "private." S.B. was also asked what part of her body Defendant touched. S.B. circled the vaginal and neck areas on the drawing of the female and labeled the vaginal area "bladder." Minix testified that S.B.'s reference to her private part as her bladder showed her age level and her mindset.

Detective Lisa Ivey interviewed Defendant, who denied raping S.B. Defendant said he did not know what occurred and would not do anything to hurt

S.B. Defendant indicated S.B. accused him because she wanted to live with her father. Defendant stated the only other male in the home on June 30, 2019, was S.B.'s little brother. Defendant reported it was not possible that S.B. snuck out of the house on June 30, 2019.

Detective Ivey was unaware of any contamination by Defendant of State's Exhibit 4, panties collected by the SANE nurse from S.B.; State's Exhibit 5, a t-shirt worn by S.B. at the hospital; and State's Exhibit 6, a second t-shirt worn by S.B. It was Detective Ivey's understanding that S.B. did not change clothing after the rape. She did not notice any blood on Defendant's pajama pants collected from the home during the execution of a search warrant.

Detective Ivey's report did not indicate whether Defendant left home on June 30, 2019. She did not consider whether S.B. could have left home and had sex with a neighbor. There was nothing in Detective Ivey's report, which she wrote after receiving information from the SANE nurse, regarding an attempted rape in Defendant's bed. However, S.B. discussed it during her CAC interview. Detective Ivey later testified that the report contained information regarding an attempted assault on June 30, 2019, around noon but did not mention whether S.B. was sleeping on a couch or bed at that time.

Detective Ivey took photographs of S.B.'s phone. She testified the phone's search history indicated that prior to the date of the offense there were searches for "[p]orno," "[s]ex in public," "[a] whole party has sex," "[s]ex that never ends," and "[k]ids having sex[.]" The phone was not in S.B.'s control when found by police.

Tammy Smith was accepted as an expert in the field of sexual assault nurse examiner. Smith testified about the triage nurse's notes as follows:

[T]his started last night. Mother states she woke up with a text message from the brother stating that the patient told her father that her mother's boyfriend raped her. Patient states that she fell asleep on the couch last night. When she woke up, her mother's boyfriend had her over the couch. Patient states that mother's boyfriend pulled down her pants. Patient became fearful - - tearful and mother stated she told me that she just laid there and pretended to be asleep because she didn't know what else to do. Mother reported that patient told her there was penile penetration.

S.B. reported that she was not sexually active. S.B. said she was assaulted by Defendant in the living room. S.B. indicated she pretended to be asleep because she did not know what to do. Smith further testified regarding information provided by S.B.:

> The next portion of the exam is actually the physical history of what happened. So the first part was your vagina penetrated by a penis? She said yes. I said a finger, a tongue, an object? She said no. And when I said - - when I asked her if she - - her vagina was penetrated by a penis, she said, well, he did, and I - - and so I clarified. I said he put his penis in your vagina, and the patient nods yes. And then I - - then we asked was your rectum penetrated? She answered no to all of those answers. And was your mouth penetrated by anything, and she answered no to all of those.
>
> I asked her about ejaculation, and she was unsure. She didn't know what - - I - - I don't believe she knew what that was.
>
> And then I asked her if his mouth had come in contact with her skin anywhere, and that's how we know where we need to swab . . . .
>
> I asked her if he had used a condom or any other contraceptive, and she didn't know.
>
> And then I asked if he had used any kind of lubricant, and she said, no, he didn't put anything on her body.
>
> And then I said, well, how was your body positioned during the assault. And she said he had me laying over the couch. The top half of my body was on the couch. The rest - - the rest of me was on the floor.

S.B. also related the following history to Smith:

She said first time. Around lunch I was trying to take a nap. I woke up, and he was trying to do it, but he couldn't do it. He left me, and I

went back to sleep. Second time. I was sleeping on the couch. Then I woke up, and he had me laid over the couch. I pretended to be asleep. He started pulling down my shorts. Then he started to do it. And then I clarified. What did he start to do? He started to put his mmm (phonetical interjection) in my mmm (phonetical interjection). After like five or ten minutes, he stopped and put my body back like I was when I was asleep. Then he fell asleep. I got my pillow and blanket and went back to bed. I didn't know what to do. I got my phone. I texted my dad about it, and he told me to pray.

And then mom's statement said, when I woke up, I had missed a lot of messages from my mom and brother. My brother texted me he - - he was sad this had happened to [S.B.] I went into her room, and I tried to look at her phone, but it was dead so I asked her what happened. She said she did - - he did like -- he did the "R" word to me. We waited for him to leave for work because [S.B.] didn't want me to say anything with him around. After he left, I called my mom, and we went to the hospital.

Smith conducted a vaginal exam. With the use of an alternate light source (ALS), Smith saw something on S.B.'s clitoris, clitoral hood, labia majora, and labia minora. She also noted red and black discolorations at the eight o'clock position and at the three through five o'clock positions of the hymen. When Smith touched the areas with a Q-tip, they bled. Smith described the red and black areas as blood blisters. She also noted a small red discoloration at the one o'clock position. Smith concluded S.B.'s injuries were consistent with the history given by S.B. Smith further stated: "she said that he attempted to put it in one time and that he put his penis in her vagina, and her injuries are consistent with blunt force trauma." The blunt force trauma was on S.B.'s hymen. Such injuries could also have occurred as the result of consensual sex.

Monica Quaal was accepted as an expert in the field of forensic DNA analysis. Quaal testified no semen was found in the sexual assault kit or underwear submitted to the lab. The underwear were also negative for blood. However, the left inner labia swab indicated the presence of blood. Defendant's DNA was not

found on the items tested by the lab. Y chromosome (Y-STR) testing was done by the North Louisiana Crime Lab.

Quaal testified that she had seen multiple studies wherein DNA transferred between items washed together without harsh conditions or bleach. Quaal was further questioned as follows:

Q     Okay. Had [a penile swab] been done, would you think that the pajama pants that he allegedly had on during the timeframe of this alleged assault might provide some useful DNA for you?

A     As we discussed, in laundry machines, there's contamination, so if, like, there's one of her shirts washed with his pants, then I could get her DNA off his pants anyway. So it might not have been an item that we would have worked either.

Q     And by the same rationale, if his pajama pants were washed with her panties, right, then arguably his microscopic - - very minute amounts of his DNA could be on her panties?

A     Yes, that's why we did not take swabbing of the panties and go forward with them, and that's why we worked the - - the items selected from the [rape] kit.

Q     And if she then put those panties on, there could be a secondary or tertiary depending on how many between - -

A     Like quad- - - quad - - yeah, the fourth level.

Q     Yeah, quad.

A     I don't know.

. . . .

Q     There could be a transfer of DNA?

A     Yeah, that would be an extended, yeah, transfer degree, but I'm not saying it's impossible. I've not seen studies where people have done something like that. I'd be interested to see studies like that.

. . . .

Q     And -- and I was going to use that. So, like, if I - - if I am folding clothes - - if I'm home with the kids and one of my jobs is to

fold clothes, I mean, in fact, it's very likely that my DNA will be on their clothes?

A     Possibly, yes, sir.

Q     If I fold towels and they wipe themselves with a towel or wash themselves, transfer DNA possible?

A     Yeah, if you fold very close and spend a lot of time with your clothing. I mean, I think sometimes some items might have a better chance of that, - -

Q     Uh-huh (yes).

A     - - a towel being one that you're going to fold. Panties, normally people are - - just have a - - a small amount of contact with, but I can't say how much contact that someone might have had with the panties.
On redirect, the State asked:

Q     And do you know comparatively what the likelihood of transfer DNA existing on a swab from the victim's vagina in a SANE kit versus her clothing would be?

A     I don't really know statistically what that would be, but there is a lot more reasonable explanation for having contact with clothing whether it be from clothing to clothing, like we discussed the folding of the clothing, all the other reasons why someone might leave their DNA on clothing and - - and not on a vagina.

According to Quaal, vaginal secretions, urine, saliva, and some cleaning solutions can fluoresce with an ALS.

Michelle Jackson was accepted as an expert in forensic DNA analysis.  She performed Y-STR testing in this case.  Jackson testified regarding the test results as follows:

So Y-STR results were obtained from the extract from the reference from Jason Craft . . . and then the extract from the right outer labia swab from [S.B.], the extract from left outer labia swab from [S.B], the exact [sic] from right inner labia swab from [S.B.], and the extract from the left labia swab from [S.B].

And then that Y-STR haplotype obtained from the extract from the right outer labia swab, the left outer labia swab, the right inner

16

labia swab, and the left labia swab was consistent with the reference sample from Jason Craft.

Jackson explained that a haplotype "is the DNA profile. That's the part of the Y chromosome that I'm basing my results on." Jackson further explained:

> A    . . . the haplotypes that I got from that evidence looked the same as the haplotype that I got the reference - - from the reference sample Jason Craft.
>
>     . . . .
>
> A    . . . Therefore, Jason Craft and all male individuals within his paternal lineage cannot be excluded as a donor of the haplotype observed, and using the Y-STR Haplotype Reference Database, the - - that's the release, No. 62, in the upper confidence interval of 95 percent. The Y-STR haplotype obtained from the items that I had just listed was not observed in that database of 29,275 haplotypes, and it is not expected to occur more frequently than one in 9,773 male individuals in the U.S.

Jackson indicated that if Defendant had a son, they would have the same haplotype.

Jackson was also questioned about DNA transfer. She testified there was a chance of Y-STR transfer during the laundry process. She stated, "There's a chance of transfer from clothing to person, but it's more of the washing from item to item that I would expect more transfer." She was then asked:

> Q    . . . So if you and I wash a pair of jeans, your jeans and my jeans, that maybe your DNA may transfer from your jeans to my jeans?
>
> A    Correct.
>
> Q    All right.
>
> A    There is a chance of that, yes.
>
> Q    And then if I put on my jeans and then put my hand in my pocket or whatever, then there's a chance your DNA will be found on my body?
>
> A    There's a chance, yes.

17

Jackson would not do Y-STR testing on clothing that was laundered together because she would not want "it" to be misleading. She indicated that testing an item taken directly from an individual would minimize the chance of DNA transfer.

Defendant called Angela Ross to testify. She was accepted as an expert in forensic DNA. Ross testified with regard to DNA that "the natural process of laundering your clothes in your house - - with everybody in your household, it's going to transfer. It can transfer."

In brief to this court, Defendant contends the State failed to prove he had vaginal sexual intercourse with S.B. He argues that S.B. was a "sexually inquisitive adolescent who often searched the internet for sexually explicit materials, which did not include any contact with him." He contends the physical and scientific evidence was insufficient to substantiate S.B.'s allegations. Furthermore, according to Defendant, S.B.'s account of the alleged rape was inconsistent. Assuming he was the perpetrator of a sexual assault, Defendant suggest there was no evidence that S.B. saw his penis as she testified that her eyes remained closed as she pretended to be asleep. Thus, S.B. only presumed it was his penis, and S.B. "was unable to confirm anything resembling ejaculation occurring." Defendant further suggests Smith's testimony did not establish that the bruising found on the hymen was caused by penile penetration. Additionally, no evidence of semen was found in the rape kit.

Defendant points to alleged inconsistencies in S.B.'s description to Smith and Dr. Bergstedt. Defendant suggests that because Quaal found no DNA on the items she tested, the physical evidence did not corroborate S.B.'s story. Moreover,

the Y-STR testing included all male individuals in Defendant's paternal lineage. Defendant further suggests:

> [Defendant] and the alleged victim's mother share a home together in a familial setting with her children and [Defendant's] son, who frequents the home. Clothes are washed and folded together. The alleged victim has laid in the bed that [Defendant] shares with her mother. His DNA, as the expert witness described, is on clothing, sheets, bedding, bath towels, walls, dishes etc. Therefore, traces of [Defendant's] Y-STR haplotype, contributed by himself or his son, a male in his paternal lineage[,] could have been easily transferred to the alleged victim absent physical contact.

"[I]it is well-settled that the victim's testimony, alone, is sufficient to establish penetration." *State v. Green*, 16-938, p. 18 (La.App. 3 Cir. 7/19/17), 248 So.3d 360, 373, *writ denied*, 17-1348 (La. 4/27/18), 239 So.3d 836. In *Green*, the defendant argued that the state failed to prove he had sexual intercourse with the victim inasmuch as she testified she *believed* that he penetrated her with his penis. The defendant noted the victim's initial statement to police indicated she did not remember if anything sexual occurred, the SANE nurse could not say whether the tears in the victim's vagina were caused by a penis, no seminal fluid was found in the victim's vagina, and his DNA was not found in the items tested. The defendant argued that digital penetration could have caused the injuries. This court addressed the issues presented:

> Considering the victim's testimony in the present case—she answered affirmatively when asked if she felt penetration; she believed the penetration was from Green's penis; and she felt pain when she awoke to Green on top of her—along with the physical findings that were consistent with sexual assault, the evidence was sufficient to prove the sexual intercourse element in the present case. *See State v. Traylor*, 42,218, p. 5 (La.App. 2 Cir. 6/20/07), 961 So.2d 571, 574, *writ denied*, 07-1561 (La. 1/11/08), 972 So.2d 1163, where the court found that even though the victim's cross-examination may have caused confusion as to whether there was penetration by the defendant's penis or finger, the victim's testimony of penile penetration was supported by physical evidence, and the jury, as the trier of fact, weighed her testimony.

*Id.* at 373-74.

We find the evidence presented was sufficient to prove vaginal sexual intercourse beyond a reasonable doubt. Physical and scientific evidence are not required to convict Defendant. The victim's testimony alone can be sufficient to establish the elements of a sexual offense. *State v. Thacker*, 13-516, p. 15 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, (quoting "*State v. Ware*, 11-337, p. 4 (La.App. 3 Cir. 11/23/11), 80 So.3d 593, 597, *writs denied*, 11-1391 (La. 3/9/12), 84 So.3d 549, and 12-46 (La. 8/22/12), 84 So.3d 358).

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

*State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, (alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138.

S.B. reported penile penetration to her mother, Smith, and Minix and penile penetration into the vaginal area to Dr. Bergstedt. The physical evidence supports this contention. Smith testified that S.B. suffered blunt force trauma to her hymen, including redness and bleeding. Dr. Bergstedt testified he found a healed hymenal tear that was consistent with penetration. S.B. denied any prior sexual activity, which was confirmed by Dr. Bergstedt, who determined his findings were not consistent with repeated penetration. Scientific evidence found Y-STR of Defendant's lineage on vaginal swabs from S.B. Hanks testified that neither Defendant's son nor any of Defendant's male relatives had been at the home during the month prior to the assault, and she did not see Defendant's son often.

20

Despite Defendant's claims that his son frequented the home, the only testimony as to Defendant's son was presented by Hanks. Defendant attempted to convince the jury that the Y-STR found on S.B.'s vaginal swabs was present due to communal laundering. Nevertheless, there was no testimony about the family's laundry practices.

Defendant points to Google searches and asserts S.B. was "sexually inquisitive." However, S.B. denied performing the searches, and the searches do not pertain to the rape at issue. The jury heard any inconsistencies between the location of the rape and the position S.B.'s body was in at that time. S.B. consistently reported that Defendant raped her. Based on *Green*, we find, contrary to Defendant's contentions, that S.B. was not required to see his penis enter her vagina. Moreover, ejaculation is not required to prove a rape occurred.

The jury's verdict indicates it chose to believe S.B.'s report that Defendant raped her. Based on the testimonial, physical, and scientific evidence, and the decision in *Green*, we affirm Defendant's conviction.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant contends the trial court improperly determined he possessed the requisite mental capacity to proceed to trial. For the reasons discussed, we find this assignment of error lacks merit.

*Defendant's Argument in Brief*

Defendant asserts that Dr. Kristen Luscher, a clinical psychologist, observed processing issues during her evaluation of Defendant and notes that Defendant scored a 22 out of 30 (26 being the average) on the Montreal Cognitive Assessment (MoCA), a test that "assesses areas relevant to a defendant's ability to assist in his defense[.]" Defendant further asserts that Dr. Luscher's evaluation of

21

Defendant took between eight and ten hours over the course of multiple visits, while the evaluation by Dr. Alfred Buxton, another clinical psychologist evaluation took "merely an hour, maybe two." Since Dr. Luscher's evaluation "sufficiently raised the issue of [Defendant's] cognitive ability to assist his attorneys in preparing his defense pretrial and during trial[,]" Defendant contends the trial court should have found that Defendant proved his incompetency by a preponderance of the evidence. Finally, Defendant argues the trial court should not have simply deferred to the majority of physicians on the panel, citing the following jurisprudence:

> "While a thorough mental examination is necessary, the final determination of a defendant's competency to stand trial must rest in a judicial authority; it is a legal, rather than a medical issue. The trial judge should not rely so heavily upon the medical testimony that he commits the ultimate decision of competency to the physician" *State v. Harris*, 518 So.2d 590, 598 (La. App. 1st Cir. 1987), *writ denied*, 521 So.2d 1184 (La. 1988).

*State's Argument in Brief*

The State asserts that it is clear its ruling that the trial court relied heavily upon the factors outlined in *State v. Bennett*, 345 So.2d 1129 (La.1977), and not just the reports of the physicians. Additionally, the State contends, the trial court relied upon Defendant's background, noting his ability to read between the ninth and twelfth-grade levels and his ability to run his own mechanic business.

*Sanity Hearings*

On July 15, 2021, defense counsel submitted a motion to appoint a sanity commission to the trial court. A letter from a psychiatrist was submitted with the motion. The trial court set the sanity commission motion for a contradictory hearing to be held the following day. On July 16, 2021, Defendant presented the testimony of Dr. Luscher, accepted by the trial court as an expert in clinical

psychology. Dr. Luscher testified that she had recently evaluated Defendant (July 2) and found he "exhibit[ed] significant deficits in the area of verbal comprehension which falls in the intellectual disability to borderline range[.]" Dr. Luscher further testified:

> I am seeing evidence that there is clinically significant deficits in his intellectual or cognitive abilities that require further specificity of - - of assessment, but it leads me to question both based upon my observations of him, my meetings with him, and my testing as to whether he's understanding adequately information that I am saying to him or that - - that - - that is being presented to him in written form, and there's questions about - - based on those findings that there may be some organicity going on that needs further assessment, and that is what I raised to you, Ms. Lawdins.

After hearing Dr. Luscher's direct examination as well as the State's cross-examination, the trial court found there was a preponderance of evidence to warrant the appointment of a sanity commission. On July 16, 2021, the trial court issued a written order appointing a sanity commission. On July 19, 2021, the trial court issued another written order appointing the same sanity commission, adding a date for one of the examinations.

On October 4, 2021, the trial court held a hearing to decide Defendant's competency to proceed to trial. Dr. Buxton, the first witness to testify at the hearing, was accepted as an expert in "clinical/medical psychology." Dr. Buxton testified that he evaluated Defendant in preparation for the hearing and submitted a report. According to Dr. Buxton, his evaluation consisted of a records review, a clinical interview, and testing. When asked what tests he performed, Dr. Buxton stated that he performed the Wechsler Abbreviated Scale of Intelligence test, which gives an estimate of intelligence; the Bender-Gestalt test, which detects perceptual or psychomotor problems; the Draw-A-Person test, which calls for a projective drawing of a person; and the Georgia Court Competency Test.

23

Dr. Buxton testified that he judged Defendant competent to stand trial and explained his findings as follows:

A passing test - - a passing score on the Georgia Court Competency Test. He was aware of - - of the charge and appreciates its seriousness. He adequately understood the roles of defense counsel, prosecutor, Judge, the jury, witnesses, and defendant. He could adequately distinguish between pleas of guilty, not guilty, and not guilty by reason of insanity - - by reason of insanity. He can protect himself and utilize the legal rights available to him. He understands available defenses. He understands the range of possible verdicts as a consequence of a conviction. He can recall and relate facts pertaining to his actions and whereabouts at certain times. He's able to assist counsel in locating and examining witnesses. He can maintain a consistent defense and inform his attorney of distortions or mistakes of others. He's able to make decisions in response to well-explained alternatives. He's able to testify relevantly and be cross-examined, if necessary, in his own defense. He can refrain from irrational and unmanageable behavior at trial. He can tolerate the stress of trial and while awaiting trial.

When asked how confident he was that Defendant was competent to stand trial, Dr. Buxton replied: "Fairly . . . Confident enough I put it in a report."

On cross-examination, defense counsel asked Dr. Buxton if he was qualified to diagnosis traumatic-brain injuries. Dr. Buxton responded:

A. - - am I a neuropsychologist? No. I'm a clinical psychologist. There's a difference.

Q. Can you elaborate on that difference?

A. Neuropsychologists specifically get training in neuroscience. I received training both at the master's and the Ph.D. level. I just never bothered to pursue getting licensed as a neuropsychologist. I wasn't that interested in it. I was more interested in being a clinical psychologist.

Do I understand neuropsychology? Yes.

When asked if he could define decisional competence, Dr. Buxton replied:

Decisional competence? Whether or not he's able to make a decision, sure. He's able to make a decision to his benefit. I mean, the man runs a business. I think he does - - makes decisions every day. He does them fairly competent. I think he has a fairly successful

business.  If I understand correctly, he repairs heavy equipment, so he has to understand mechanics, hydraulics, . . . mechanical electrics. He's got a lot on his - - on his plate as well as run a business.  So he's got to understand business to a certain degree to keep himself afloat.

When defense counsel asked Dr. Buxton if having a traumatic-brain injury would impact a person's ability to assist his counsel, Dr. Buxton replied that it would depend on the degree of the trauma.  According to Dr. Buxton, if Defendant had an impairment, it would negatively impact areas of his everyday life, not just his functioning in the courtroom.  Dr. Buxton explained:

A mild cognitive impairment perhaps could lead to some mild deficits in functioning, but it wasn't to any degree, if it's there, that it - - that I would say he wasn't competent to proceed to trial, that he could not participate in trial because, again, it's not being cross validated by what's happening in real life.

Dr. Buxton testified that he did not have the medical records relating to an assault suffered by Defendant.  According to Dr. Buxton, he was told by Defendant that Defendant was assaulted in jail.  Dr. Buxton also learned that Defendant was knocked out in the assault.  Dr. Buxton did not review Dr. Luscher's testimony at the July 16, 2021 hearing; thus, Dr. Buxton was not aware of Dr. Luscher's concerns regarding Defendant's competency.

Dr. Buxton opined that Defendant has an adjustment disorder, which Dr. Buxton opined was reasonable considering the serious charges Defendant is facing. Dr. Buxton noted that Defendant had a history of anxiety and a history of alcoholism.  According to Dr. Buxton, Defendant drank between twelve to twenty-four beers per day but only drank after hours.  Thus, Defendant's drinking did not interfere with his daily functioning.

25

Dr. Buxton testified that his examination of Defendant lasted one to two hours. When asked if he asked requested Defendant's medical records when he learned that Defendant had lost consciousness in the assaults, Dr. Buxton replied:

> No, . . . 'cause there was nothing that was going to lead me in that way. That's a rabbit hole. I wasn't going down a rabbit hole. I looked, again, what's happening in his real life, okay. It's not just what he's doing with me. I'm comparing that to what's happening in the man's everyday life. Is it interfering with his ability to conduct his everyday life? The man's busy. He's got a thriving business. When he saw me, he had come in from Houston. He was working a job in Houston. Remembered he had an appointment. Took time off. He even got here early to make sure that he was here for the evaluation. So pretty good forethought. Pretty good planning. Pretty good judgment. He had to put his moneymaking aside to come take care of business with me for a competence or a sanity eval, and he did everything you would expect somebody to do who has the wherewithal, and he had the wherewithal to do that.

> So there's nothing to tell me that there's a brain injury to a degree that it's impairing his everyday functioning.

> . . . .

> My job is does he function well enough to participate in legal proceedings? Yes, he does. Are there deficits? There's deficits in everybody in this room. If we get out and test everybody in this room, we're going to find deficits. Does it impair functioning? That's the thing. Does it impair your ability? Capability? I think that was your question. Is he capable? Yes.

Dr. Buxton testified that he had no concerns about Defendant malingering and believed Defendant answered questions the best he could. Defendant was punctual and well dressed for the evaluation. Dr. Buxton described Defendant as straightforward, honest, and forthright during the evaluation.

Dr. Buxton agreed with defense counsel that he diagnosed Defendant with "an adjustment disorder with mixed anxiety and depressed mood untreated with degree of impairment mild to moderate and prognosis fair[.]" Dr. Buxton explained his diagnosis as follows:

Adjustment disorder is a disorder you go to when you expect the condition to be transient. In other words, it's a response to the stress he's under. Being charged with rape and potentially looking to spending life in prison, "pretty stressful". So you would expect - - again, it's a normal reaction to an abnormal life situation, not an abnormal reaction to a normal life situation. So I would expect - - I - - if I was in a similar situation, I'd probably have an adjustment disorder, trust me. It's - - it's - - so it's - - it's just recognizing what's going on with him.

. . . .

But it is generally regarded as being transient. So once the stress is removed, generally the adjustment disorder resolves. If it stays, then you go on to another diagnosis.

When asked if this diagnosis could potentially affect Defendant's ability to handle the stress of trial, Dr. Buxton replied, "Somewhat. It's not going to preclude it." Dr. Buxton explained that Defendant could possibly have an anxiety attack.

Dr. Buxton acknowledged that he was not a neuropsychologist and had never diagnosed "verbal comprehension and auditory processing deficits[.]" Finally, when asked if he was certain Defendant did not have a traumatic-brain injury or closed-head injury, Dr. Buxton replied:

I haven't seen anything that says closed-head injury. Could he have had a concussion? Yeah. That's a form of traumatic-brain injury from an assault. So it's possible. Is it probable? Yes. But there's other explanations. You can't throw out the other explanations. You can't ignore them. That it could have preexisted. I'm not saying the findings are wrong. I'm saying it could have preexisted, period.

Dr. Buxton concluded the cross-examination by stating that he was not ruling out that Defendant had a traumatic-brain injury.

On re-direct, the State listed the *Bennett*, 345 So.3d 1129, criteria as follows:

Whether the defendant understands the nature of the charge and can appreciate its seriousness. Whether he understands what defenses are available. Whether he can distinguish a guilty plea from a not

27

guilty plea and understands the consequences of each. Whether he has an awareness of his legal rights. Whether he understands the range of possible verdict and the consequences of conviction. Whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times. Whether he is able to assist counsel in locating and examining relevant witnesses. Whether he is able to maintain a consistent defense. Whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements. Whether he has the ability to make - - to make simple decisions and response [sic] to well explained alternatives. Whether, if necessary, to defense strategy he is capable of testifying in his own defense. And, finally, to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.

According to Dr. Buxton, each of the above factors were covered by the Georgia Court Competency Test. When asked if Defendant met the criteria listed above, Dr. Buxton replied, "Yes. He passed the George Court Competency Test which covers every point that you mentioned[.]"

Finally, when the State asked Dr. Buxton if it was possible for someone to be competent to stand trial after losing consciousness, the following colloquy took place:

A.     Well, yes, but, again, it's degree of severity. Even if there's residuals, it's degree of severity.

Q.     And - -

A.     So, once again, what you look is you look for cross validation. It isn't going to just affect what you do in an evaluation.

. . . .

Q.     If there would have been a traumatic-brain injury for Mr. Craft such that it affects his level of competency to stand trial, would your evaluation have found such an injury or found such an issue regarding this competency?

A.     If there would have been a question in my mind as to whether or not he would have been competent, I would have stated such and would have recommended further evaluation.

28

When Dr. Buxton's testimony was concluded, the State submitted a copy of Dr. Richard Edwards' report as S-2. The report was received into evidence without objection. The report states Defendant "understands the proceedings against him and is able to describe the roles of various entities that will be involved in his case." In the "Physical Examination" section of his report, Dr. Edwards stated the following about Defendant:

> Appearance: Arousal: Alert Attentiveness: attentive Appearance: appropriate Attitude: cooperative Activity: no abnormal movements Orientation: Fully oriented Mood: appropriate Affect: normal Verbal: normal tone/cadence Thought process: normal/organized Thought content: no delusions, no suicidal/homicidal ideation Perceptions: Not responding to internal stimuli Memory: Normal word recall Advanced Function: able to spell WORLD forwards/backwards, performs serial sevens Intelligence: Average

Finally, Dr. Edwards stated the following in the "Plan" section of his report: "At this time I believe that Mr. Craft has the ability to participate in his own defense. He has no debilitating psychiatric illness that I can discern. He is clear to proceed with his case from my standpoint."

The hearing resumed on October 13, 2021, at which time Defendant called Dr. Luscher as a witness. Dr. Luscher was accepted as an expert in the field of clinical psychology. Dr. Luscher testified that she had experience in diagnosing traumatic-brain injuries and memory deficits. The report Dr. Luscher prepared after her evaluation of Defendant was accepted into evidence as Defendant's Exhibit 1.

Dr. Luscher testified that she met with Defendant for about eight-and-a-half to ten hours in total. Dr. Luscher learned that Defendant was socially promoted in school because of his age. Additionally, Dr. Luscher learned that Defendant was hospitalized after he was beaten and burned with scalding water while in the Jeff

Davis Parish jail. Dr. Luscher understood there to be two separate incidents of Defendant being beaten. Defendant believed he had lost consciousness at least twice but could not be sure. When asked if medical records supported what Defendant told her, Dr. Luscher replied:

> Right. So they - - they talked about that he had been assaulted and beaten, that there was bruising that documented it in his - - on his - - on the right side of his preorbital face. It - - it documented the burns, and - - and then there were resulting evaluations and assessments - - or, I mean, tests that had been conducted. Yes, it was consistent with what he said.

Dr. Luscher opined that the beating Defendant received led to a brain injury.

Dr. Luscher testified that she performed the MoCA on Defendant. The test, Dr. Luscher testified, is designed to look at a person's cognitive deficits and designed to indicate whether there is organic brain dysfunction. According to Dr. Luscher, Defendant received a score of 22 out of 30, with a normal score being 26 or above. Dr. Luscher opined that Defendant's lower score resulted from the difficulty he had in learning information verbally presented to him. Defendant also had difficulty, Dr. Luscher testified, with cognitive speed and with abstract concepts.

Another test administered by Dr. Luscher was the malingering test, a test designed to determine whether someone is attempting to feign symptoms or be untruthful about deficits for "secondary gain." Dr. Luscher testified that Defendant's score for the malingering test fell within the "classification of non-exaggerating of symptoms[.]" As a result of administering the Wechsler Adult Intellectual Scale, Dr. Luscher opined that something was "going on" with the left hemisphere of Defendant's brain. When asked if she recalled Dr. Buxton testifying that he administered the Wechsler Abbreviated Scale of Intelligence test

30

on Defendant, Dr. Luscher stated that Dr. Buxton administered the test within two months of when Dr. Luscher administered the test. Dr. Luscher clarified that Dr. Buxton administered an abbreviated exam while Dr. Luscher administered the full exam. According to Dr. Luscher, readministering the test within six months may result in an improved IQ score because of the "practice effects[.]" Dr. Luscher explained:

> [T]he improvement that Dr. Buxton reported compared to my scores are consistent with those that you would expect to see with practice effects, and so that has to be taken into account, meaning that it looks like, oh, his IQ's just fine, but IQ is not - - IQ is - - is static. It's not subject to change. And so you have to be careful. You have to know if that test was given in that timeframe so that you can take into account practice effects.

Dr. Luscher administered the Wide Range Achievement Test (4th ed.) (WRAT), which is designed to look at a person's reading score, reading comprehension, and math abilities. Using a mean score of 100, plus or minus a standard deviation of 15, Defendant had a word reading score of 95; a sentence comprehension score of 84; and a spelling score of 92. These scores, she testified, all fell in the average, showing no indication of a reading disability.

Another test administered by Dr. Luscher was the Test of Memory and Learning (TOMAL), which allowed the doctor to see what was going on with Defendant's verbal memory and functioning on the left side of the brain and see what was going on with his visual memory and functioning on the right side of the brain.

According to Dr. Luscher, the tests she administered "provide strong indication that Mr. Craft has . . . deficits that are going on in the left hemisphere that are not normal[.]." As for the difficulties Defendant had during the exam, Dr.

Luscher stated that Defendant would pause for a long time before answering a question.  Dr. Luscher testified that she had to rephrase the question at times

When asked whether she believed Defendant was competent to stand trial, Dr. Luscher answered:

> So when I look at Mr. Craft, he definitely shows a lot of the signs or shows the diagnostic criteria as I outlined in my report for what's called a mild - - mild neurocognitive disorder.  A mild neurocognitive disorder says there's something not going on with the brain.  There is organicity.  There is indication that the brain is damaged or that there is something not working.

The cause of the disorder, Dr. Luscher testified, could be Alzheimer's, traumatic-brain injury, or some other medical issue.  Although a traumatic-brain injury could be the cause, Dr. Luscher could not "identify a specific etiology[,]" which is why she diagnosed Defendant as having an "unspecified neurocognitive disorder."

Although Dr. Luscher did not disagree with Dr. Buxton's opinion that Defendant is able to function in the line of work that he has created for himself, Dr. Luscher opined that those skills are not the skills needed in a trial setting. Additionally, Dr. Luscher stated that Defendant's ability to do automotive work is not relevant to whether he possesses the skills to assist his counsel.

On cross-examination, Dr. Luscher testified that she was not diagnosing Defendant with a neurocognitive disorder due to a traumatic-brain injury.  Rather, she diagnosed Defendant with an unspecified neurocognitive disorder, "where the etiology is not definitive . . . ."

Dr. Luscher agreed with the prosecutor that Defendant seemed to perform better on "word selective reminding, object recall, and paired recall" than on "memory for stories."  Dr. Luscher explained:

So what - - so just to give a little basis, sir, I mean, if you look at, like, object recall and paired recall, what - - what we're doing is we're looking at his learning ability on that. So he's given a list of words. He's asked to recall as many as he can remember. He's - - we do that five times to determine whether he's able to acquire information. So this - - this is all information that is repeated to him multiple times, multiple times. He does not get the information repeated to him multiple times in th[e] memory for stories. That's what he is able to obtain from me giving it to him in one presentation.

When asked if Defendant would be able to read written reports and discuss them with his attorney, Dr. Luscher replied, "I think certainly. I mean, he could - - he could read information and - - and discuss it with his attorney, yeah."

On re-direct, Dr. Luscher testified that it did not matter when Defendant was injured. What was relevant, Dr. Luscher testified, was how Defendant was functioning at the moment.

When asked if she thought Defendant could be rehabilitated, Dr. Luscher replied:

Possibly, but not - - prognostically, it's probably poor. So if - - if what we are looking at is even if he had preexisting conditions and then he loss consciousness in 2019, and let's say that there was an assault to the brain, I mean, when you look at cognitive rehabilitation, what you find is we kind of have a window of time. So if you know about cognitive rehabs after a stroke or a traumatic-brain injury, immediate cognitive rehab is recommended because what you find is that the skills that somebody is likely to acquire occurs within the first two years post - - you know, postevent [sic]. After about two years, the likelihood of restoring those - - those skills is very, very poor. So what I understood - - and I didn't see it in any medical records and I asked Mr. Craft, but I didn't understand this is, you know, assuming that he has not had any cognitive rehab. So if - - regardless of what was going on with the loss of consciousness on two occasions that occurred in 2019, he's now at that window where the - - where the prognosis for restoring those skills is very poor when it comes to brain, and I think Dr. Buxton talked about plasticity the other day, and so he talked about how the brain is - - has plasticity, meaning that it can compensate for other parts or plasticity also deals with the regeneration or the re - - not the regeneration but the reinstituting or the - - or - - or making connections between neurons. So the brain when it's had, like, an event, we'll just use a stroke, you know, where there's - - where the blood kills those - - those neurons, they have the

ability to kind of reconnect but only to a certain amount of time. Rehab promotes that. If you miss that window, the likelihood is it's - - it's pretty poor prognostically.

After both sides presented argument, the trial court issued the following ruling, finding Defendant competent to stand trial:

All right. The Court is aware of the issue in front of it. It's the [Bennett] rule, all right. As to foundational competency, there's no questions. All experts know he knows the court system. He knows what he's charged with. He knows who's representing him; who's on the other side.

Now, it all comes back to decisional competency, okay, and I will - - you know, that is the issue before the Court. And, again, as Mr. Cassidy has raised, there were three issues raised by Dr. Luscher.

Now, I'm going to state for the record there's been no proof of any closed-head injury or any brain trauma, okay. So that's not before the Court, okay, but before the Court is if there is a mild dysfunction or any type of dysfunction. I must state for the record it does not automatically preclude the defendant from assisting counsel, okay. Nobody is perfect. Everybody has - - may has some dysfunctions.

Okay. The question two is: Does this dysfunction prevent Mr. - - God, my mind - - Mr. Craft to assist his counsel? Now, I - - I'm - - I'm going to – I got to go back to Dr. Buxton some here because I have a gentlemen that reads between the ninth – and twelfth – grade level and can comprehend which is unusual is above average because the newspapers are a bit - - or designed for people who read at the sixth-grade level, okay. He's able. He - - he is a man that has his own business. Now, he is a mechanic, yes. I understand that. That's visual. We all understand that, and his dysfunction may be verbal communication, but we all know that a mechanic has to take instructions from his client. A mechanic has to get parts from that verbal discussion, and then he has to have a verbal discussion with his client. Mr. Craft has appeared in this courtroom every time he was ordered to come back by me, okay. So he - - he followed a verbal command. Now - - now, the fact that he has this dysfunction, I do not - - I do not think it prevents him from assisting counsel, okay. With his education, with his business practice, he can assist counsel in his defense and as to the witnesses.

So let's go through it here. Can he listen to testimony of witnesses? Yes. Now, is he going to be perfect in that? I don't know. Okay. The attorney is - - is his - - representing him. They need to assist him, okay. All right. He must inform lawyers of any distortions. All right. Well, that's a possibility but is it - - has it been

proven by a preponderance of the evidence? The answer is no, because even in Dr. Luscher's own reports, he's average intelligence or - - or just a little below. He's not mentally impaired by any means as to the verbal communication. So this is an average person or a low average person with high reading comprehension who can definitely assist his attorneys in that matter. Now, whether he testifies or not, this anxiety - - and - - and anybody that has to take the stand or are charged is going to have some stress. That's normal, okay. This man runs a business. He has stress. He can handle it.

So, all right, I believe Dr. Buxton and Dr. Edwards have said he's competent. I understand what Dr. Luscher said, but I think he can assist counsel in his representation. So I find him competent.

*Law and Analysis*

Louisiana Code of Criminal Procedure Article 647 states the following regarding the determination of whether a defendant has the competency to proceed with trial:

> The issue of the defendant's mental capacity to proceed shall be determined by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to proceed may be introduced at the hearing by the defense and by the district attorney.

According to La.Code Crim.P. art. 648(A), "The criminal prosecution shall be resumed unless the court determines by a preponderance of the evidence that the defendant does not have the mental capacity to proceed." Since "there is a legal presumption that a defendant is sane and competent to proceed[,]" the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial." *State v. Snyder*, 98-1078, p. 9 (La. 4/14/04), 874 So.2d 739, 745, *vacated on other grounds*, 545 U.S. 1137, 125 S.Ct. 2956 (2005) (citing La.R.S. 15:432; *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *cert.*

*denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003); *State v. Martin*, 00-489 (La. 9/22/00) 769 So.2d 1168, 1169, *writ denied*, 01-1743 (La. 3/28/02), 812 So.2d 647; *State v. Frank*, 96-1136 (La. 10/4/96), 679 So.2d 1365, 1366.) "A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion." *Id.* (citing *Bridgewater*, 823 So.2d at 888; *Martin*, 769 So.2d at 1169).

"[T]he trial judge's determination of mental capacity to assist at trial is entitled to great weight, especially where the evaluation of credibility or the resolution of conflicting well-founded medical testimony is concerned. Here the trial judge evaluated the conflicting evidence and found defendant competent to proceed." *State v. Brooks*, 541 So.2d 801, 807 (La.1989) (citation omitted).

This court has stated the following:

In *State v. Bennett,* 345 So.2d 1129, 1138 (La.1977), the Louisiana Supreme Court stated that the appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include:

whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.

In addition, the supreme court provided factors to consider in determining an accused's ability to assist in his defense:

whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the

> testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
>
> *Id.*
>
> The supreme court further provided that "[t]he decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced." *Id.*

*State v. Bello*, 14-19, pp. 2-3 (La.App. 3 Cir. 5/7/14), 161 So.3d 720, 722-23 (alteration in original).

Finally, the supreme court has held that "'[m]ere weakness of mentality or subnormal intelligence does not of itself constitute legal insanity.'" *State v. Edwards*, 257 La. 707, 243 So.2d 806, 808 (1971) (quoting *State v. Chinn*, 229 La. 984, 87 So.2d 315 (1955); *State v. Brodes*, 160 La. 340, 107 So. 131 (1925)).

We find the trial court's determination that Defendant was competent to proceed to trial should not be disturbed. Both Dr. Buxton and Dr. Edwards opined that Defendant was competent to stand trial. Dr. Buxton testified at length as to the evidence he considered in making his determination, specifically finding that Defendant met all of the *Bennett* criteria. Defendant's expert, Dr. Luscher, testified that Defendant's reading ability fell within the average range. Dr. Luscher noted that Defendant's reading comprehension level was around the ninth grade level and his reading level was around eleventh and twelfth grade levels, both being higher than the sixth to eighth grade level of the newspaper. Dr. Luscher also agreed that Defendant would be able to read written reports and discuss them with his attorney. Dr. Luscher diagnosed Defendant with having a "mild

neurocognitive disorder." Although Dr. Luscher opined that Defendant's ability to recall pertinent facts and actions at certain times would be significantly impaired, Defendant's ability to make decisions would be impaired, and his ability to testify would be compromised, the trial court weighed this opinion against the opinions of Dr. Buxton and Dr. Edwards. We find the trial court's evaluation of conflicting well-founded medical testimony should not be disturbed. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends the trial court erred in allowing the State to proceed to trial with evidence that was untimely disclosed and improperly preserved. Defendant specifically alleges: 1) the State's failure to timely disclose DNA crime lab evidence was fundamentally unfair and constitutes a *Brady* violation; and 2) the State's failure to preserve S.B.'s cell phone constitutes prejudicial error.

### DNA Evidence

On January 13, 2022, Defendant filed a "Supplemental Motion for Discovery." Therein, Defendant sought information from DNA testing labs, including laboratory case files, chain of custody records, protocol and procedure manuals, data files for STR/Y-STR testing, maintenance/troubleshooting records, incident reports/corrective action records for the analysts who handled Defendant's case, education/certification information for personnel who handled Defendant's case, and laboratory accreditation/inspection records.

At the hearing on the motion, defense counsel asserted the additional information was needed for an entire picture of "their DNA scope and what they actually used." Defense counsel noted Defendant received additional evidence

38

regarding DNA in November 2021. The State declared the only thing provided in November was chain of custody information, and it did not have "what they're looking for." Thereafter, the State argued the motion was untimely filed under La.Code Crim.P. art. 521, which provides that pretrial motions be filed within thirty days after receipt of initial discovery. The trial court said it had always known this case was based on DNA, and defense counsel agreed. Defense counsel asserted that upon receipt of the chain of custody information, it became apparent that the requested information was needed. The trial court mentioned that trial was to begin in five days, and defense counsel asserted, "it's a very doable request." The State informed the trial court that it would contact the labs about the information requested.

After a recess, the State subsequently informed the court and defense counsel that it had contacted Monica Quaal at Southwest Louisiana Criminalistics Laboratory and was informed that she could provide the chain of custody, her CV, and a scanned version of all printed documentation for the case, which would include many of the pieces of data that were requested, but she "would need until Monday to do all of that." Additionally, she would need a couple of weeks to get the full list of documents. The trial court again noted trial was set to begin Tuesday and told the State to get what documents it could by Monday.

The State also contacted Michelle Jackson with the North Louisiana Crime Lab. The email from Jackson was discussed as follows:

> [T]he laboratory case file is scanned in, but that is just the hard copy. Three, the chain of custody would be easy to send as a PDF. Four, protocols and procedures are requested are very broad. Additionally, not all of our protocols and procedures apply to what was done in this case. What is requested in the document is literally thousands of pages and would be quite cumbersome. Furthermore, the request is unclear regarding the timeframe. Protocols and procedures change over time

with the implementation of new instrumentation, software, et cetera. Number five, I can pull the data files, but it would take me a couple of days. Number six, the maintenance records, if any, would be available. Again, it would take me some time to compile the appropriate ones. Number seven, for this one, I would have to go through all documentation beginning March 11th, 2019, until now to see what/if any applies. This would take me a day or two, I'd estimate. Number eight, I can provide my CV which contains most of the information, but if all of my proficiency results are required that would be an issue. I've had two proficiency tests a year since 2009. Our document retention policy does not require us to keep these records for that long. Number nine, I would have to speak to my quality manager to see where the current accreditation records are. I know the certificate and scope are easy enough for me to obtain. Number ten, did not apply to her and that was - - that relates to the cellphone. She notes that if all of these were added up it would easily take me a couple of weeks to compile, and it will be thousands of pages.

Counsel asserted she faxed a copy of the request to the State on January 7, and on January 10, the State confirmed it had received the request. However, the State had not contacted the labs in an effort to "preserve this information and have it ready to go." Defense counsel argued that if the items could not be produced, then "they should not be able to utilize them in any way whether introducing them specifically into the record at trial or even formulating testimony based on these things."

The trial court ordered both labs to produce what they could by Monday, stating it would not continue trial because everyone knew DNA was the issue.

Defendant alleges the State failed to timely disclose the lab notes of the Southwest Louisiana Criminalistics Laboratory and North Louisiana Crime Lab and the data they used to reach their conclusions regarding the DNA evidence presented. Thus, his right to fundamental fairness was violated. Defendant additionally argues the late disclosure deprived him of his ability to obtain an expert opinion about testing and protocol which could have raised alternative and

40

reasonable hypotheses of innocence. He alleges he requested the crime lab notes and data "early on" in an attempt to obtain an expert's opinion about the data, and disclosure of such information on the eve of trial constituted a *Brady* violation. Defendant further asserts the trial court erred in allowing the State to proceed to trial without providing a detailed account of what data and information could not be timely presented because there is a "questionable reliability in the verdict rendered, based on the substantial weight of the scant DNA evidence actually presented" in his case.

The State asserts there was no prior, specific request for the documents set forth in the supplemental motion, as evidenced by defense counsel's remarks at the hearing.[5]

Defendant claims the request for crime lab notes and data was made early on. However, at the hearing on the supplemental motion, defense counsel Lawdins specifically stated that upon receipt of the chain of custody information in November of 2021, it became apparent that the requested information was needed. The motion to supplement followed in January of 2022. Subsequently, defense counsel Doran was asked why the motion was filed a week before trial, and he stated, "because it's that clearer now that this is what we need." Defense counsel also asserted the State received the motion on January 10, 2022, and failed to gather the information by January 19, 2022, the date of the hearing.

It is clear from the record of the hearing that Defendant was aware he needed the lab notes and data in November 2021, and did not specifically request

_____

[5]The State also asserts lack of reasonable diligence by Defendant in seeking or obtaining the documents, his ability to cross-examine Quaal and Jackson, and the fact that he called his own expert to testify defeat his *Brady* claim.

the information until January 13, 2022. Thus, we cannot say the State untimely disclosed the requested information.

Defendant also asserts late disclosure of the requested documents was a *Brady* violation. Defendant made no argument regarding *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), in the trial court when addressing the supplemental discovery motion. Thus, this issue has not been considered as it is not properly before this court. Uniform Rules—Courts of Appeal, Rule 1-3.

Defendant's claim that the trial court erred in allowing the State to proceed to trial without providing a detailed account of what data and information from the crime labs could not be timely presented is not properly before this court inasmuch as Defendant did not ask the trial court to order the State to provide a detailed account of that information. Uniform Rules—Courts of Appeal, Rule 1-3.

Defendant also filed a "Motion to Nolle Pros Indictments and Dismiss Criminal Charges, Alternative Motion in Limine and/or Motion to Suppress, Due to Failure to Timely Disclose Evidence and Incorporated Memorandum" on January 13, 2022. The motion was also addressed at the hearing held on January 13, 2022, and per argument of counsel, dealt with chain of custody documents. Defendant references the motion in this assignment of error but does not reference the record page numbers for the hearing on the motion, refer to the trial court's ruling thereon, or ask the court to review any ruling regarding chain of custody. Thus, the issue is not properly before this court for review. Uniform Rules—Courts of Appeal, Rule 2-12.4.

*Cell Phone*

On November 24, 2021, Defendant filed a "Motion to Preserve Evidence." Therein, Defendant sought an order directing the district attorney's office and law

enforcement to preserve "[a]ny and all evidence on the victim's cell phone, including but not limited to the actual undamaged phone, search history, camera roll, text message history and social media history." The trial court granted the motion on November 24, 2021.

At a hearing held on January 19, 2022, defense counsel asked for access to the cell phone records of S.B. Counsel then asserted she believed there was not only impeachment evidence on the phone but also "actual additional evidence[.]" She further stated: "They took a picture of the child's cellphone history, but then *returned the phone*. We're asking for the history because I believe it's imperative to our case." (Emphasis added). The trial court indicated it did not know how Defendant would get the information before trial, and Defendant could have asked for the information a long time ago. Counsel responded:

> I did request the . . . cellphone history. I asked if the cellphone was in evidence. I was instructed that the cellphone was, in fact, not in evidence. So, now, here we are, yet again, I'm asking for . . . the history, or if they still have the same cellphone, that we be granted access to the cellphone itself.

The State then indicated it did not have the cell phone. The trial court asked if S.B. still had the cell phone, and the State responded: "I don't know. I can't . . . I just don't have an answer." The trial court noted that to obtain the history, Defendant could subpoena the records, but the information would not be available before trial. Defense counsel asserted that discovery did not contain the name of the cell carrier or the owner of the phone. The court responded: "[Y]ou should have done that sooner. I can't . . . do it today, okay. . . . Now, if they have the child's cellphone, I ask them to produce it, okay, if the child still has it, okay." After a recess, the State indicated that it had not been able to contact S.B.'s mother.

However, if it later did and she provided any new information, it would pass that information on to Defendant.

Defendant alleges the State's failure to preserve the cell phone constitutes prejudicial error. According to Defendant, the State ended its investigation and failed to retrieve any additional information from S.B.'s phone, including the cell phone carrier and a "'dump'" of the contents of the phone, after finding the search history and texts presented at trial. Defendant further contends the State's answer at the hearing, that the phone was not in evidence and it did not know whether S.B. still had the phone, was highly inadequate and indicative of bad faith because it was aware of the potentially exculpatory evidence contained on the phone. Thus, the trial court erred in allowing the State to proceed without proper explanation as to why the phone and its contents were not preserved, depriving Defendant of the ability to examine the totality of the evidence and prepare a defense.[6] In support of his argument, Defendant cites the following from *State v. Gossby*, 47,772, p. 13 (La.App. 2 Cir. 3/6/13), 111 So.3d 494, 503, *writ denied*, 13-760 (La. 11/1/13), 125 So.3d 418 (citation omitted): "The theory of spoliation of evidence refers to an intentional destruction of evidence for the purpose of depriving the opposing parties of its use. . . . The presumption of spoliation is not applicable when failure to produce the evidence is adequately explained."

Counsel's statements at the hearing prove she was aware the phone was not in evidence. She made no argument regarding spoliation of evidence, bad faith on

_____

[6]The State notes the motion to preserve was filed in 2021, and the decision not to take the phone into evidence likely occurred in 2019, when the investigation began. Furthermore, defense counsel knew before the motion to preserve was filed that the phone was not taken into evidence and not in possession of the State. Moreover, the State's obligation to disclose exculpatory evidence does not relieve the Defendant of its obligation to investigate and prepare a defense. The State cites *State v. Dyer*, 12-1166 (La. 10/26/12), 101 So.3d 38, wherein the supreme court pointed out there is no absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

44

the part of the State, or an inability to prepare a defense. Because these claims were not first raised in the trial court, we find the issues presented by Defendant are not properly before this court for review. Uniform Rules—Courts of Appeal, Rule 1-3.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, Defendant contends the trial court improperly allowed the State to unilaterally amend the bill of indictment once trial started and erred by denying his motions for mistrial.

The indictment originally charged Defendant with committing first degree rape on June 30, and the State amended the indictment to charge Defendant with committing first degree rape "on or between June 30, 2019 and July 1, 2019." Defendant also objected to and moved for a mistrial regarding the State's reference to a sexual incident that occurred between Defendant and the victim earlier in the day of June 30, while the actual rape occurred around 1:00 a.m. on July 1. For the following reasons, we find this assignment of error lacks merit.

*Proceedings at Trial*

During the State's opening statement, defense counsel objected to the State's use of June 30 as the date of the offense. According to defense counsel, Defendant was charged with an incident that occurred on July 1. The State and the trial court, however, noted that the indictment said the date of the offense was June 30. The State asserted that the incident actually occurred during the night between June 30 and July 1. Defense counsel stated that there was an allegation of an incident (not rape) on June 30 and then the allegation of rape on July 1.

In its opening statement, the State asserted the following:

45

So . . . [the victim] was asleep on the couch. She is awoken by Mr. Craft. He pulls down her pants. He inserts his penis into her vagina. She doesn't know what to do. She pretends to be asleep. Finally, he stops. He puts her back the way she was sleeping, and he goes. He leaves the room. [The victim] waits until she believes Mr. Craft is asleep. She goes to her bed not knowing what to do. She texts her dad. Her dad is Shaun Lamas. Shaun Lamas then creates a Facebook post. It is seen by Brittany's brother, Mr. Jacob Bellard. Mr. Jacob Bellard the next day on July 1st contacts [the victim's] mother, Brittany Hanks. Brittany wakes up [the victim]. They go to the hospital, and they call the police, and that's when this investigation starts. But those are the facts that we are going to present to you.

Subsequently, during the testimony of Dr. Scott Bergstedt, defense counsel objected when Dr. Bergstedt testified, "So, basically, [the victim] stated that on - - there were two episodes within a 24-hour period of time. The first one occurred on 6/30." The following colloquy ensued:

MR. DORAN:

Yeah, we object to any mention of an alleged first incident. This is kind of what we were talking about earlier.

THE COURT:

I know what you're talking about. There's two incidences, okay.

MR. DORAN:

There's been no - - no notice of any 404(b) made prior of intent to utilize anything other than the alleged rape.

THE COURT:

All right.

Okay. Who's going to address that issue?

MS. NAQUIN:

Your Honor, it - - it's all part of the same incident. It's all part of the same act. There was an attempt hours before there was actual success.

46

. . . .

MS. GALLIEN:

    I was going to say when we were talking about this earlier, it was separated - - when we talked about this earlier, they said - -

    . . . .

    I would say that when describing this earlier when we had this issue come up, they indicated like it was two different acts. So if they say it's the same one, I - - I disagree.

When the trial court stated that it did not know enough about the timing of the incidents to be able to determine if they were *res gestae*, defense counsel explained that the first incident allegedly occurred around noon on June 30th. The second incident, defense counsel alleged, supposedly occurred during the early morning of July 1, when there was successful penetration. Defense counsel argued that the two incidents were clearly two different incidents. Claiming that they did not see any investigation of the first incident, defense counsels alleged they had no notice that the first incident would be referred to at trial.

The State responded:

MR. CASSIDY:

    Ms. Naquin may be able to go into more detail, Judge, but this is - - I mean, this is clear black letter res gestae evidence. I mean, you can't do them on - - the incident occurred on the - - the day of the 30th and then the night of the 30th. He does an exam. He - - there's no separation when he does the exam. He can't separate the two things.

    . . . .

MR. CASSIDY:

    - - It's one - -

    . . . .

MR. CASSIDY:

- - aggravated incident as far as the case is concerned.

The trial court overruled defense counsel's objection. The trial court reasoned, "This doctor examined her. This is what he - - she told him and he's talking about the exam, okay." Defense counsel reiterated that the State should have put Defendant on notice that it intended to discuss two incidents of sexual assault since Defendant was indicted on only one incident. The trial court told defense counsel that he could make an objection for another witness, but it was finished discussing the doctor's testimony. Defense counsel put the trial court on notice that it would move for a mistrial outside the presence of the jury at the conclusion of the doctor's testimony.

Dr. Bergstedt resumed his testimony, stating the following:

Q.     So, Dr. Bergstedt, I apologize for the interruption. I believe that you were going through the history that you had received from [the victim].

A.     Okay. On - - on the 25th of July, when I saw [the victim], she basically described two episodes that occurred within a 24-hour period of time. They were at the - - they were - - occurred at the home where she was residing, and Jason Craft, who is her 39-year-old mother's ex-boyfriend at the time, was living with them at the home. Mom was at work, and [the victim] had stated that Jason had been drinking. At around noon on 6/30/2019, she was sleeping on the sofa in shorts and a t-shirt. She describes as Jason grabbed and pulled her off - - off the side of the sofa and pulled her pants and panties down while she was laying on her stomach. She felt his penis from behind, and it was uncomfortable but denies him penetrating her at that time. She acted like she was asleep. So there was no conversation between them at that time. He stopped after a while and pulled her pants and panties back up and laid her back on the sofa.

Later that night at about 1:30 in the morning on 7/1/2019, she was sleeping, again, on the sofa in the living room. Jason pulled her pants and panties down again. She was laying on her back at this time. He put his penis in her vaginal area. She stated it hurt and blood was noted. It lasted about five minutes she said. She acted like she was asleep

48

At the conclusion of Dr. Bergstedt's testimony and outside the presence of the jury, defense counsel moved for a mistrial.

The trial court denied the motion for mistrial without stating any reasons. Defense counsel stated that he would like to make the motion for mistrial a continuing motion.

When the jury exited the courtroom at the end of the first day of trial, defense counsel moved for a mistrial. Defense counsel argued that the testimony clearly established that the incident occurred on July 1, 2019, and not on June 30, 2019, as indicated in the indictment. The State responded that the date of the offense is not an element of the offense; thus, there were no grounds for a mistrial. The State offered to amend the bill, but defense counsel argued the State could not amend a grand jury indictment. Defense counsel further argued:

> MS. LAWDINS:
>
> Your Honor, I would note that if the State were to amend the bill, it would demand a mistrial because you can't amend a bill once - - once trial has started - - once the trial has started. The purpose of the bill of indictment is to give notice to the client [sic] of what they're being charged for and - - and specific to the date and when the crime actually occurred. The State had the same evidence that we had. It is July 1st. The testimony clearly establishes it's July 1st, 2019. Their expert testified to it. Their victim testified to it. It is July 1st, 2019, not June 30th.

The State responded:

> MS. NAQUIN:
>
> And if - - if I may respond to that, Your Honor. We're relying on the time concept of a ten year old. The testimony is clear that it happened during the evening hours. Whether it's before or after midnight is splitting hairs, and the State argues that that - - the exact timeframe of the different incidents has not been determined clearly like that.

The trial court took the matter under advisement until the following morning.

The following day, the State filed a written motion to amend the bill of indictment, amending the date of the offense from June 30, 2019 to "on or between June 30th, 2019, and July 1st, 2019." Since the date is not an essential element of the offense charged, the State argued that the amendment did not involve a substantive defect.

Defense counsel objected, asserting that two separate incidents were at issue – one on June 30 at about noon, and the other on July 1 at about 1:00 a.m. "[E]ssentially," defense counsel argued, "they've been having a trial, one trial, on two distinct and separate crimes." Defense counsel further claimed the State would not find any case wherein a court allowed the State to amend a bill of indictment to include incidents separated by twelve hours. Defense counsel argued:

> If you take the evidence as presented thus far, this man committed two crimes. That's the problem. . . . That's why they don't get to amend because now it's not simply a matter of which day did the one crime that we're here to - - to try occur on. It is now you've got two separate incidents that the jury has heard all about. It's substantive. It changes things, and just like the State made the argument that we - - we got open file discovery, so we should be put on notice, well, no, I'll - - I'll go back again to our arguments about the fact that the Code of Criminal Procedure requires it. We asked for it. You're suppose [sic] to tell us what other incidents that you have out there, 404(b), res gestae, or whatever it is, okay. But my point is: They've already presented this to a grand jury. Essentially, if you take Mr. Cassidy at face value with what he told the Court before they presented this to the grand jury with the understanding that the alleged rape, not the attempted rape, occurred on June 30th. They were confused. We now know better. And we now know that if [the victim's] story is taken at face value, you've got two separate events. Thus, this trial has been both violative of his double jeopardy which we - - we raised that - - that point in our motion and - - but at a very minimum, it's substantiates the grant of a mistrial.

50

The State responded:

> As - - as it relates to Mr. Doran's intention that we have two distinct and separate crimes or two distinct events, Your Honor's already ruled. I mean, it - - it is res gestae, and he is incorrect because there is case law out there that grooming somebody for rape can come in as res gestae. An attempted rape can come in as res gestae for a rape, and so that's what this is. And it - - it is - - it's not 24 hours apart. It is approximately 12 hours apart.
>
> And so here what I did not hear from Mr. Doran because what nobody will hear from any defense attorney is that the date of offense is an essential element of this crime because it is not. It simply is not. It's a formative defect, and the State can cure it with an amendment.

The State concluded its argument by noting that the time of the rape was approximated by the victim and that it is possible the rape occurred before midnight on June 30th.

The trial court denied the motion for mistrial and allowed the State to amend the indictment.

*Defendant's Argument in Brief*

Defendant asserts a mistrial should have been ordered because the State was allowed to substantively amend the indictment after trial had begun. Defendant cites La.Code Crim.P. art. 487(A), which provides, in pertinent part, that an indictment may be amended prior to trial with respect to a defect of substance, but after trial, a defect of substance mandates a mistrial. Defense counsel emphasizes that the charging instrument that was amended was a grand jury indictment rather than a bill of information. The State's *res gestae* argument, defense counsel contends, is meritless since the two incidents of sexual assault were twelve hours apart and were not so intertwined that one could not be mentioned without the other. The State's failure to provide notice of its intent to use the incident that

51

occurred about noon on June 30, defense counsel asserts, violated La.Code Evid. art. 404(B) and violated Defendants right to prepare a defense.

## State's Argument in Brief

The State asserts that the amendment to the indictment was proper since the date and time of the offense charged were not essential elements of the charge. The State further argues:

> At the trial on this matter, right before opening statements, the bill of indictment was read to the jury. Once the State began its opening statements an objection was made by the defense counsel saying the bill of indictment was incorrect because the date of the offense was July 1, 2019, and not June 30, 2019. The State responded that the alleged incident occurred on June 30, 2019, but was not reported until July 1, 2019. The defense then responded that the discovery did not portray this. Between a reading of the minutes and the transcript, it is abundantly clear that there was confusion as to when the actual rape occurred. Due to the fact that the actual rape occurred at the very early hours of July 1, 2019, and also reported that day, there was confusion as to whether the rape began on June 30, 2019, and led into July 1, 2019, or only occurred on July 1, 2019. Even if the defense does not specifically state how it was prejudiced [sic]. The defense made it clear that they received the discovery and were familiar with the details of the event. Furthermore, the defense extensively cross-examined the victim and her family. There was also no indication that their defense relied on the dates of occurrence or on some form of alibi.

## Law and Analysis

We find there are two different issues being argued in this assignment – whether a mistrial should have been granted because the State was allowed to amend the indictment after trial had begun, and whether a mistrial should have been granted because the State was allowed to discuss a prior incident of sexual assault without giving the defense notice under La.Code Evid. art. 404(B).

## Amendment of Indictment

Louisiana Code of Criminal Procedure Article 487 provides, in pertinent part:

A. An indictment that charges an offense in accordance with the provisions of this Title shall not be invalid or insufficient because of any defect or imperfection in, or omission of, any matter of form only, or because of any miswriting, misspelling, or improper English, or because of the use of any sign, symbol, figure, or abbreviation, or because any similar defect, imperfection, omission, or uncertainty exists therein. The court may at any time cause the indictment to be amended in respect to any such formal defect, imperfection, omission, or uncertainty.

Before the trial begins the court may order an indictment amended with respect to a defect of substance. After the trial begins a mistrial shall be ordered on the ground of a defect of substance.

Louisiana Code of Criminal Procedure Article 468 states the following regarding the necessity of the date and time being charged in an indictment:

The date or time of the commission of the offense need not be alleged in the indictment, unless the date or time is essential to the offense.

If the date or time is not essential to the offense, an indictment shall not be held insufficient if it does not state the proper date or time, or if it states the offense to have been committed on a day subsequent to the finding of the indictment, or on an impossible day.

All allegations of the indictment and bill of particulars shall be considered as referring to the same date or time, unless otherwise stated.

This court has held that the date of the offense is not an essential element of aggravated rape. *State v. Johnson*, 95-1002 (La.App. 3 Cir. 3/6/96), 670 So.2d 651. Since La.R.S. 14:42(E) states that a reference to aggravated rape is the same as first degree rape, the date of the offense is not an essential element of first degree rape, the offense charged in the grand jury indictment at issue. "If the date or time is not an essential element of the offense charged, a mistake respecting the date on which the offense occurred is only a defect of form, which may be corrected at any time with leave of court." *State v. Frith*, 436 So.2d 623, 627

(La.App. 3 Cir.), *writ denied*, 440 So.2d 731 (La.1983) (citing *State v. McCoy*, 337 So.2d 192 (La.1976); *State v. Sharp*, 321 So.2d 331 (La.1975)).

As for Defendant's suggestion that the State's authority to amend a grand jury indictment is limited, this court has stated the following:

> It is clear that the district attorney has the power and authority to amend grand jury indictments, both as to amendments of form and as to amendments of substance. *State v. Sheppard*, 350 So.2d 615 (La.1977); *State v. Bluain*, 315 So.2d 749 (La.1975). This power is controlled by LSA–C.Cr.P. art. 487. This article indicates that an amendment as to form may be done at any time and that an amendment as to substance is proper if done prior to commencement of trial. Based on this statutory authority and the facts of this instance, it makes no difference whether the amendment was as to form or substance, since both would be considered timely and properly amended under article 487.

> In any event, the date and time of the commission of an offense need not be alleged in the indictment, unless the date or time is essential to the offense. (See LSA–C.Cr.P. art. 468). A mistake respecting the date on which an offense occurred has been held to be a defect of form when not essential to the offense. *State v. Lawson*, 393 So.2d 1260 (La.1981); *State v. Dye*, 384 So.2d 420 (La.1980); *State v. Drew*, 360 So.2d 500 (La.1978). The dates are not essential to the offenses charged here. Therefore, based on LSA–C.Cr.P. art. 487, supra, the amendment could have been made at any time.

*State v. Guin*, 444 So.2d 625, 630 (La.App. 3 Cir. 1983) (footnotes omitted).

Defendant claims the State's amendment affected his ability to present a defense and "'exercise fully his rights of confrontation and cross-examination' about the alleged assault." This court has stated the following regarding the purpose of a charging instrument:

> In *State v. Johnson,* 93-394. p. 3 (La.6/3/94), 637 So.2d 1033, 1034-35, the supreme court discussed the amendment of bills of information as follows:

> > La. Const. 1974, Art. I, § 13 provides that "[i]n a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him." This requirement protects the accused's right to prepare a defense and exercise fully his rights of confrontation and

54

cross-examination. *State v. Germain,* 433 So.2d 110 (La.1983). The bill of information must therefore inform the defendant of the nature and cause of the accusation against him in sufficient detail to allow him to prepare for trial, as well as to allow the court to determine the admissibility of the evidence. *State v. Marcal,* 388 So.2d 656 (La.1980); *State v. Meunier,* 354 So.2d 535 (La.1978). Accordingly, the state may not substantively amend a bill of information to charge a new offense once trial has begun. La.C.Cr.P. art. 487; *Cf., State v. Roberts,* 319 So.2d 317, 320 (La.1975), rev'd on other grounds, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), on remand, 340 So.2d 263; *State v. Bluain,* 315 So.2d 749 (La.1975)[.]

*State v. Simon*, 10-1111, p. 10 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 325 (alteration in original), *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922.

We find Defendant's claim of prejudice has no merit. First, the original indictment stated the date of the offense was June 30, 2019, the date on which the noon incident occurred. Thus, Defendant should have been aware that any alleged sexual assault that occurred on that date may be introduced at trial. Furthermore, as discussed below, the noon incident is considered an integral part of the actual rape that occurred in the early morning hours of July 1. Thus, Defendant should have known of the possibility that the noon incident would be introduced at trial. At no point did the defense claim it was unaware that the noon incident occurred or ask for a continuance/recess to be able to adequately prepare. Moreover, defense counsel actually cross-examined the victim about a discrepancy between her testimony regarding the noon incident and the victim's statement to Dr. Bergstedt.

Considering the above, we find there was no error in the trial court's allowance of the State to amend the grand jury indictment as to the date of the offense. Additionally, Defendant failed to prove that any prejudice he suffered by the amendment was substantial.

Louisiana Code of Criminal Procedure Article 720 (emphasis added) provides:

> Upon written motion of defendant, the court shall order the district attorney to inform the defendant of the state's intent to offer evidence of the commission of any other crime admissible under the authority of Code of Evidence Articles 404 and 412.2. *However, that order shall not require the district attorney to inform the defendant of the state's intent to offer evidence of offenses which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding* or other crimes for which the accused was previously convicted.

The supreme court recently described "*res gestae*" evidence as follows:

> Next, as evidenced by its argument at the motion in limine hearing, the State contends the overdose evidence is admissible as res gestae evidence. In order to qualify as such, the evidence must constitute "an integral part of the act or transaction *that is the subject of the present proceeding.*" La. Code Evid. art. 404(B)(1) (emphasis added). This court has approved the admission of other crimes evidence when it is related and intertwined with the *charged* offense to such an extent that the State could not have accurately presented its case without reference to it. *State v. Boyd,* 359 So.2d 931, 942 (La.1978). The purpose behind the res gestae exception is to allow the State to "complete the story of the *crime on trial* by proving its immediate context of happenings near in time and place." *State v. Brewington*, 601 So. 2d 656, 657 (La. 1992) (emphasis added).

*State v. Hackett*, 22-1322, p. 2 (La. 12/6/22), 350 So.3d 862, 863 (per curiam).

In *State v. Taylor*, 01-1638, p. 12 (La. 1/14/03), 838 So.2d 729, 742 n.7, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036 (2004), the supreme court gave the following as examples of *res gestae* evidence:

> See also *State v. Sharp,* 35,714, p. 28 (La.App. 2 Cir. 2/27/02), 810 So.2d 1179, 1196 (other crimes evidence of arson was admissible in homicide prosecution as integral part of events leading up to killing; defendant conducted day-long search for victim that included burning home, breaking into a house to steal a gun, and trading vehicles to avoid detection); *State v. Jenkins,* 573 So.2d 218, 221-222 (La.App. 5th Cir.1990) (knowledge by police officer of defendant's prior criminal history of drug activities admitted as *res gestae*); *State v. Argo,* 476 So.2d 409, 412 (La.App. 2d Cir.1985), *writ denied,* 481

So.2d 1347 (La.1986) (evidence of offenses committed during seven or eight hours before attempted murder of police officer was admissible as *res gestae* when crimes so closely related and intertwined that the state could not have presented complete story of the charged offense without them).

In *State v. Broussard*, 95-792 (La.App. 3 Cir. 12/6/95), 664 So.2d 835, this court addressed whether the trial court erred in admitting the victim's videotaped statement when the statement contained references to other crimes evidence without any *State v. Prieur*, 277 So.2d 126 (La.1973), notice. This court stated the following:

> In the videotaped statement, T.C. mentions sexual conduct other than oral sex which the defendant engaged in with her. In one instance, T.C. stated, "Bubby [the defendant] takes off my clothes—and he takes off his clothes—and he gets on top of me—and he does sex." T.C. stated the defendant put his "bottom" on hers and made her touch his "bottom." Because the conduct was sexually different from the conduct for which he was charged, Broussard claims the conduct was inadmissible absent *Prieur* notice.

> No *Prieur* notice is necessary when the other crimes evidence sought to be introduced forms an integral part of the crime charged. La.Code Evid. art. 404(B)(1); *State v. Prieur*, 277 So.2d 126 (La.1973); *State v. Goza*, 408 So.2d 1349 (La.1982). In *State v. Osborne*, 593 So.2d 888 (La.App. 2 Cir.1992), the court found that acts of oral sex and threats made to the victim were integral parts of the charged offense of aggravated rape. Although T.C.'s testimony does not clearly indicate when the other sexual acts occurred in relation to the charged conduct, the acts described by T.C. nevertheless constituted a continuous course of conduct; and, as such, were integral parts of the crime charged.

*Broussard,* 664 So.2d at 838.

Considering the definition of *res gestae*, the examples given by the supreme court in *Taylor*, and this court's opinion in *Broussard*, we find the sexual incident that occurred between the victim and Defendant on June 30 was admissible as an integral part of the offense charged. Thus, no *Prieur* notice was necessary.

For the foregoing reasons, we find this assignment lacks merit.

57

## ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, Defendant contends the trial court repeatedly erred in allowing expert reports of State witnesses Smith, Quaal, and Jackson to be admitted into evidence after the experts testified during trial.

At the time the State moved to introduce S-20, Smith's report, defense counsel objected, arguing that expert reports are not admissible. The State argued that the reports were medical records that were not required to be certified because the expert testified in court. The trial court overruled the objection.

During Quaal's testimony, the State moved to introduce State's Exhibits 22, 23, and 24.[7] At that time, defense counsel stated: "Your Honor, so, as to expedite, there were some objections that were stated to the previous experts' reports, we'll just reiterate them[.]" The objection was overruled.

During Jackson's testimony, the State moved to introduce State's Exhibit 25, Jackson's report. Defense counsel responded: "Your Honor, we previously made some objections that were stated in depth in detail before the Court and it will continue for this one." The trial court allowed the exhibit to be admitted.

Defendant contends the reports of Smith, Quaal, and Jackson are hearsay and can only be presented to a witness to refresh his/her memory. Defendant alleges that, as a general rule, expert reports fall within the scope of hearsay because the report is an out-of-court statement that is offered to prove the truth of the matter asserted. Defendant then specifically asserts the trial court erred in denying his objections to the State's introduction of reports by Smith and Quaal

---

[7]Exhibit 22 is a DNA screening report from the Southwest Louisiana Criminalistics Laboratory. The report was signed by Kelsey Broussard and Tracy LeGros. However, Quaal supervised Broussard performing the screening. Exhibit 23 is a lab report signed by the same two people as Exhibit 22. Exhibit 24 is Quaal's DNA report.

inasmuch as the witnesses testified about their investigations and findings, investigative reports do not fall within a hearsay exception, and the reports were redundant and cumulative of their testimony.

Defendant failed to specifically object to the reports on the basis of hearsay, and a new basis for an objection cannot be raised for the first time on appeal. *State v. Carter*, 10-614 (La. 1/24/12), 84 So.3d 499, *cert. denied*, 568 U.S. 823, 133 S.Ct. 209 (2012). Thus, the claim regarding hearsay is not properly before the court for review. Uniform Rules—Courts of Appeal, Rule 1-3. Defendant also fails to indicate by number which of the three exhibits introduced during Quaal's testimony he feels was improperly admitted.

The only issue that may have been preserved by Defendant is his assertion that the reports were improperly admitted because they are cumulative or redundant since the experts testified at trial. "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." La.Code Crim.P. art. 921. Defendant did not attack the admissibility of the testimony regarding the reports at issue. Because the reports are cumulative of the testimony presented, Defendant did not suffer any prejudice as a result of the admission of the reports, regardless of whether they were properly admitted. Thus, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

In his fifth assignment of error, Defendant contends the line of questions about S.B.'s statements to her friends about sex should not have been excluded.

"Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned." *State v. Cosey*,

97-2020, p. 13 (La. 11/28/00), 779 So.2d 675, 684, *cert. denied*, 533 U.S. 907, 121 S.Ct. 2252 (2001).

> As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. LSA–C.E. art. 607(C). The right of an accused sex offender to present a defense is, however, balanced against the victim's interests under LSA–C.E. art. 412, which is meant to protect the victim of sexual assault from having her sexual history made public. The rape shield law is precisely drawn to exclude evidence of the alleged victim's sexual history with persons other than the defendant. Subpart B(1) of the article does make an exception for "[e]vidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury . . ."

*State v. Zeringue*, 03-697, pp. 13–14 (La.App. 5 Cir. 11/25/03), 862 So.2d 186, 195-96 (alteration in original), *writ denied*, 03-3523 (La. 4/23/04), 870 So.2d 298.

Louisiana Code of Evidence Article 607(C) is also subject "to the limitation set forth in La. C.E. art. 608(B), generally precluding inquiry into particular acts, vices or courses of conduct to attack character for truthfulness." *State v. Tauzin*, 38,436, p. 12 (La.App. 2 Cir. 8/18/04), 880 So.2d 157, 164.

When objecting, Defendant did not allege his inability to question S.B. undermined his ability to present a defense. A new basis for an objection cannot be raised for the first time on appeal. *Carter*, 84 So.3d 499. Thus, the claim regarding Defendant's right to present a defense is not properly before the court for review. Uniform Rules—Courts of Appeal, Rule 1-3. Defendant also failed to object on the basis that the question was asked to access S.B.'s credibility or for impeachment purposes.

In *Zeringue*, 862 So.2d 186, the defendant was convicted of carnal knowledge of a juvenile and aggravated oral sexual battery. The fifth circuit addressed the defendant's claims that the trial court erred in barring him from

examining A.B. and other witnesses with regard to alleged sexual contact she had

with her stepbrother, Sonny Whitehead, and the restrictions deprived him of his

right of confrontation and to present a defense:

> In cross-examining A.B., defense counsel asked her whether she had had sexual relations with Sonny. The State objected on grounds of relevancy, and the court sustained the objection. Counsel then asked A.B. whether her mother had ever questioned her regarding her sexual relationship with Sonny. The State again objected on grounds of relevancy, and the court sustained the objection. The defense questioned Sonny Whitehead about whether he had ever had an intimate relationship with A.B. The State objected, and the court sustained the objection. Defense counsel asked Megan Stabile, A.B.'s classmate and friend, about the victim's sexual behavior. Again, the court disallowed the line of questioning. The defense recalled A.B. to testify in its case-in-chief. Counsel again attempted to elicit information about her relationship with Sonny. The State objected, and the court sustained the objection. The defense called Megan Matherne, A.B.'s best friend, to testify. The court disallowed questions regarding what Megan knew about A.B.'s relationship with Sonny. Defense counsel attempted to question Samantha Burleigh, another classmate of the victim's, about whether she had heard A.B. say she had had sexual relations with Sonny. The court disallowed the questioning.

> Defendant complains that he was prejudiced by the trial court's refusal to allow him to make a proffer of the evidence he sought to elicit in order to preserve it for appeal. This argument has no merit. Article 412 provides that before a person accused of committing a crime that involves sexually assaultive behavior may offer evidence of the victim's past sexual behavior, the accused shall make a written motion to offer such evidence, accompanied by a written statement of evidence setting forth the names and addresses of persons to be called as witnesses. LSA–C.E. art. 412(C)(1). The motion shall be made within the time for filing pre-trial motions specified in LSA–C.Cr.P. art. 521, except that the trial court may allow the motion to be made at a later date. LSA–C.E. art. 412(D). After the motion is filed, the trial court determines the admissibility of the evidence at a hearing. LSA–C.E. art. 412(E). There is no evidence in the record that defendant complied with those requirements. In *State v. Hotoph*, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1047, *writs denied*, 00-0150 (La.6/30/00), 765 So.2d 1066, 99-3477 (La.6/30/00), 765 So.2d 1062, this Court found that, because the defendant had failed to make the proper motion under Article 412, he waived the right to introduce any evidence of the victim's past sexual history.

Moreover, defendant was not prejudiced by the restrictions the trial court placed on testimony having to do with A.B.'s sexual relationship with her step-brother. Counsel managed to elicit from A.B.'s mother an admission that she had learned of A.B.'s sexual involvement with Sonny. This assignment of error is without merit.

*Id.* at 196-97.

During cross-examination, defense counsel asked S.B. if she told her friend Navaeh that she had had sex before. S.B. responded negatively. Based on *Zeringue*, the question posed by Defendant was asked and answered by S.B.

Further, Defendant argues the trial court's ruling undermined his ability to present a defense. He suggests he did not ask S.B. about a specific incident of a sexual nature. He argues the inquiry was intended to call into question whether she made statements to others that were contrary to what she told her mother, police, and testifying experts.

In support of his argument, Defendant cites *State v. Smith*, 98-2045 (La. 9/8/99), 743 So.2d 199. In *Smith*, the defendant argued that La.Code Evid. art. 412 was inapplicable because evidence that the victim had previously accused another male of molesting her and then quickly retracted those accusations was not evidence of past sexual behavior of the victim but was impeachment evidence used to attack the victim's credibility. The supreme court held, after noting there was no physical evidence of sexual assault and the outcome of trial hinged on the trier of fact's credibility determinations:

> [B]y attempting to introduce evidence that the victim had accused her cousin of molestation and then retracted the accusation, defendant was not seeking to prove that the victim had engaged in prior sexual behavior or that she had an unchaste character. Rather, defendant sought to prove for impeachment purposes that the victim had, in the past, made false allegations regarding sexual activity. Because the evidence defendant attempted to introduce did not concern the victim's prior sexual behavior, history or reputation for chastity, we conclude that prior false allegations of sexual assault by the victim do

not constitute "past sexual behavior" for purposes of our rape shield statute. We hold, therefore, that Article 412 is inapplicable in sexual assault cases where defendant seeks to question witnesses regarding the victim's prior false allegations concerning sexual behavior for impeachment purposes.

*Id.* at 202-03 (footnote omitted).

Defendant suggests the trial court should have allowed counsel to question S.B. about prior sexual allegations for impeachment purposes. Moreover, counsel was not given the opportunity to tailor his questions in a way that was clearly indicative of impeachment rather than chastity. Thus, he was unable to adequately present his defense.

The State suggests the line of questioning sought to embarrass a teenage girl about her past sexual behavior and was prohibited by La.Code Evid. art. 412. When objecting, Defendant did not allege his inability to question S.B. undermined his ability to present a defense. A new basis for an objection cannot be raised for the first time on appeal. *Carter*, 84 So.3d 499. Thus, the claim regarding Defendant's right to present a defense is not properly before the court for review. Uniform Rules—Courts of Appeal, Rule 1-3. Defendant also failed to object on the basis that the question was asked to access S.B.'s credibility or for impeachment purposes. This issue would also be waived. Thus, the assignment of error lacks merit.

## CONCLUSION

Based on the reasons set forth in this opinion, we affirm Defendant's conviction.

**AFFIRMED.**